**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**Florence Division**

| | |
|---|---|
| **TITLEMAX OF SOUTH CAROLINA, INC.,**<br><br>          **Plaintiff,**<br><br>**v.**<br><br>**WENDY SPICHER, in Her Official Capacity as Secretary of the Pennsylvania Department of Banking and Securities,**<br><br>          **Defendant.** | **Civil Action No.**  4:24-cv-4399-JDA |

## COMPLAINT

Plaintiff TitleMax of South Carolina, Inc. ("TitleMax of South Carolina"), by and through its undersigned attorneys, for its Complaint against Defendant Wendy Spicher (the "Pennsylvania Secretary" or the "Defendant"), in her official capacity as Secretary of the Pennsylvania Department of Banking and Securities (the "Department"), alleges as follows:

## PRELIMINARY STATEMENT

1.       This action is a case premised on the concept of individual state sovereignty and the right of South Carolina to regulate business within its territorial and sovereign borders, free from regulatory overreach by its sister states. *See* S.C. Code Ann. § 1-1-10 ("The sovereignty and jurisdiction of this State extends to all places ***within its boundaries*** . . . ."); *see also Robertson v. Bumper Man Franchising Co.*, 364 S.C. 155, 157 (2005) (holding that other "state statutes have no extraterritorial effect" inside South Carolina) (citing *Ex parte First Pa. Banking & Tr. Co.*, 247 S.C. 506 (1966)).

2.       This action challenges the Pennsylvania Secretary's ongoing attempt to regulate commercial activity that takes place exclusively inside South Carolina and wholly outside the

Commonwealth of Pennsylvania in violation of the Commerce Clause, the Due Process Clause, the Full Faith and Credit Clause, and the Equal Protection Clause of the United States Constitution.  U.S. Const. art. I, § 8; U.S. Const. art. IV, § 1; U.S. Const. amend. XIV.  This action is necessary to address and protect against such unconstitutional overreach.  *See Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 582 U.S. 255, 263 (2017) ("The sovereignty of each State . . . implie[s] a limitation on the sovereignty of all its sister States,") (alteration in original) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 293 (1980)).

3.      TitleMax of South Carolina offers, among other things, consumer installment loans secured by a borrower's motor vehicle title (known as a Title Secured Loan).  TitleMax of South Carolina also offers online loans and in-store unsecured personal loans.  Regardless of the loan product, TitleMax of South Carolina originates loans exclusively within the territorial and geographic borders of South Carolina and has always done so.  Its Title Secured Loans are and always have been offered exclusively in-person at TitleMax of South Carolina's brick-and-mortar stores, which exist exclusively within the State of South Carolina.  For online customers obtaining an unsecured loan, known as "e-comm loans," the customer must have GPS locations services turned on that allows for identification of the customer within the territorial borders of South Carolina, or else the loan is not processed.  For personal loans, the customer may sign the agreement in store or online.  If signed online and if money is paid pursuant to the loan, the customer must have GPS enabled to ensure the customer is signing the loan agreement within the territorial boundaries of South Carolina.  If signed online and no money is provided (e.g., a refinance of an account with no money paid to the customer), the customer may certify the customer is within the territorial boundaries of South Carolina.

4.     Put differently, TitleMax of South Carolina does not operate, and never has operated, in Pennsylvania.  It does not originate loans in Pennsylvania (and has never done so), does not service loans in Pennsylvania (and has never done so), does not have employees in Pennsylvania (and never has), and does not disburse funds to borrowers in Pennsylvania (and has never done so).  On the contrary, TitleMax of South Carolina's limited contacts with Pennsylvania customers occur when (a) Pennsylvania citizens affirmatively choose to leave Pennsylvania to travel to brick-and-mortar TitleMax of South Carolina stores inside the State of South Carolina and enter into loan agreements with TitleMax of South Carolina in such South Carolina-based stores inside South Carolina, or (b) when non-Pennsylvania customers obtain loans from TitleMax of South Carolina stores inside South Carolina and subsequently move to and claim residency in Pennsylvania.  The loans obtained by these customers fully comply with South Carolina law and federal law, both at the time they are obtained and afterward.  And it has always worked that way.

5.     Despite these realities, the Pennsylvania Secretary, through her agents at the Department, seeks to regulate the activities of TitleMax of South Carolina which occur ***in South Carolina***.  TitleMax of South Carolina has informed the Pennsylvania Secretary, through her agents in the Department, of TitleMax of South Carolina's utter lack of connection to Pennsylvania and of the Department's lack of authority to regulate or investigate TitleMax of South Carolina, but the Department has ignored those warning shots and instead continued to make efforts to regulate and investigate TitleMax of South Carolina.

6.     Those efforts have now crescendoed.  In June 2024 the Pennsylvania Secretary, through her agents in the Department, issued to TitleMax of South Carolina an Order to Show Cause seeking an award of over $52 million in civil penalties and to require TitleMax of South

3

Carolina to refund borrowers for loans originated and serviced from wholly outside Pennsylvania.  A true and correct copy of the Order to Show Cause is attached as **Exhibit 1**.  The agents of the Pennsylvania Secretary claim to act pursuant to authority conferred by the Pennsylvania Loan Interest and Protection Law, 41 Pa. C.S. §§ 101-605 ("LIPL"), and the Consumer Discount Company Act, 7 Pa. C.S. §§ 6201-6221 ("CDCA").

7.    But the Secretary's regulatory intrusions do not terminate there.  On the contrary, the Pennsylvania Secretary, through her agents in the Department, has now also issued to TitleMax of South Carolina an investigative subpoena (the "June 2024 Subpoena") seeking voluminous records pursuant to the Department's purported authority to investigate and regulate TitleMax of South Carolina for potential violations of the same two statutes.  A true and correct copy of the June 2024 Subpoena is attached hereto as **Exhibit 2**.

8.    The threatened extraterritorial imposition of these laws on TitleMax of South Carolina violates the Commerce Clause embedded in Article I of the U.S. Constitution, the Due Process Clause and Equal Protection Clause embedded in the Fourteenth Amendment to the U.S. Constitution, and the Full Faith and Credit Clause embedded in Article IV of the U.S. Constitution.  Accordingly, TitleMax of South Carolina bring this action against the Pennsylvania Secretary under 42 U.S.C. § 1983 seeking (a) a permanent injunction barring the Pennsylvania Secretary from taking any further action against TitleMax of South Carolina; and (b) a declaratory judgment that the U.S. Constitution's Commerce Clause, Due Process Clause, Full Faith and Credit Clause, and Equal Protection Clause prohibit the Pennsylvania Secretary from enforcing against TitleMax of South Carolina the two Pennsylvania statutes for loans originated exclusively inside South Carolina's territorial and sovereign borders.  *See* S.C. Code Ann. § 1-1-10; *see also Robertson*, 364 S.C. at 157.

**The Parties**

9.      Plaintiff TitleMax of South Carolina is a lender that is licensed and authorized by the South Carolina State Board of Financial Institutions to offer supervised loans, as those loans are defined by South Carolina law.  TitleMax of South Carolina offers installment loan products out of its brick-and-mortar stores located in the State of South Carolina, as well as unsecured installment loan products both from in store and online.

10.      TitleMax of South Carolina is incorporated in South Carolina with a principal place of business in Savannah, Georgia.  TitleMax of South Carolina's brick-and-mortar stores are physically located within South Carolina's territorial boundaries and are disbursed geographically throughout the State of South Carolina.

11.      TitleMax of South Carolina's stores are located throughout the State, including in the following localities within this District and Division:

      a.      Bennettsville

      b.      Conway

      c.      Dillon

      d.      Florence

      e.      Little River

      f.      Myrtle Beach

      g.      North Charleston

12.      Some of these stores made loans that the Department now attempts to regulate.

13.      Beyond this Division, TitleMax of South Carolina also operates dozens of other stores throughout South Carolina, including stores in Aiken, Anderson, Barnwell, Batesburg, Beaufort, Berea, Bluffton, Camden, Charleston, Cheraw, Chester, Clinton, Columbia,

5

Darlington, Easley, Fort Mill, Gaffney, Georgetown, Goose Creek, Greenville, Greenwood,

Greer, Hampton, Hartsville, Irmo, Kingstree, Lake City, Lancaster, Laurens, Lexington,

Manning, Marion, Moncks Corner, Mount Pleasant, Newberry, North Augusta, Orangeburg,

Pelzer, Port Royal, Rock Hill, Seneca, Simpsonville, Spartanburg, Summerville, Sumter,

Taylors, Walterboro, West Columbia, and York.

14.    TitleMax of South Carolina's registered agent is located at 508 Meeting Street,

West Columbia, South Carolina 29169.

15.    Defendant Spicher is the Secretary of the Department and its chief executive and

administrative officer.  She is responsible for and administers the policies established for the

Department by or pursuant to applicable Pennsylvania law.  As the Pennsylvania Secretary, she

exercises managerial control over the work of the Department and its agents, including the

Department's deputies, supervisors, examiners, and administrative personnel.

## JURISDICTION AND VENUE

16.    This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and

1343.

17.    Venue in this district is proper pursuant to 28 U.S.C. § 1391(b)(2) because a

substantial part of the events giving rise to the claims asserted in the Complaint occurred in this

district.  For the same reason, venue in the Florence Division is also proper in the United States

District Court for the District of South Carolina.  *See* Local Civ. Rule 3.01(A) (D.S.C.).

18.    As discussed herein, the Pennsylvania Secretary, through the Department,

directed activities at and into the State of South Carolina by seeking to subject TitleMax of South

Carolina to Pennsylvania statutes governing loans made "in this Commonwealth [of

Pennsylvania]" based upon activities and actions that (i) were taken by TitleMax of South

Carolina, a Delaware-based entity that was licensed by and approved to do business in the State

6

of South Carolina; (ii) occurred exclusively in the State of South Carolina; and (iii) fully

complied with the laws of South Carolina and the United States.

19.     The undersigned counsel endorses and certifies that this case is properly

assigned to the Florence Division.  *See* Local Civ. Rule 3.01(B) (D.S.C.).

## FACTUAL ALLEGATIONS

### TitleMax of South Carolina's Lending Business

20.     TitleMax of South Carolina began conducting business in 2000 and is still in

operation.  TitleMax of South Carolina began operating its first brick-and-mortar store in South

Carolina on or about July 1, 2000, and currently operates dozens of stores throughout the State.

During that entire time, TitleMax of South Carolina has operated exclusively in South Carolina.

TitleMax of South Carolina is both licensed to do business in South Carolina and registered to do

business in South Carolina.

21.     TitleMax of South Carolina is currently in "good standing" in South Carolina

according to the South Carolina Secretary of State.

22.     TitleMax of South Carolina began in July 2000 making title-secured loans for

personal, family, and household purposes exclusively from dozens of brick-and-mortar stores

across South Carolina.  Today, TitleMax of South Carolina has 80 stores throughout South

Carolina.  Those stores are located in the cities of Aiken, Anderson, Barnwell, Batesburg,

Beaufort, Bennettsville, Berea, Bluffton, Camden, Charleston, Cheraw, Chester, Clinton,

Columbia, Conway, Darlington, Dillon, Easley, Florence, Fort Mill, Gaffney, Georgetown,

Goose Creek, Greenville, Greenwood, Greer, Hampton, Hartsville, Irmo, Kingstree, Lake City,

Lancaster, Laurens, Lexington, Little River, Manning, Marion, Moncks Corner, Mount Pleasant,

Myrtle Beach, Newberry, North Augusta, North Charleston, Orangeburg, Pelzer, Port Royal,

Rock Hill, Seneca, Simpsonville, Spartanburg, Summerville, Sumter, Taylors, Walterboro, West Columbia, and York.

23.     As of October 1, 2017, TitleMax of South Carolina had 239 employees who worked at its stores inside South Carolina.

24.     The loan agreement for every product that TitleMax of South Carolina offered, specifically including the interest rates on the loans, are governed by South Carolina law pursuant to a valid choice-of-law provision.  To be sure, these South Carolina loan agreements with borrowers expressly and conspicuously disclose that South Carolina governs the interest rates and agreements.  All loans made in South Carolina comply with applicable South Carolina interest rate laws.

25.     For its title-secured loans, a new loan that is originated by TitleMax of South Carolina occurs at its brick-and-mortar stores and follows a standard process.  First, a borrower enters a TitleMax of South Carolina store inside South Carolina with valid government-issued identification, his or her motor vehicle, his or her lien-free certificate of title, and any other information required by the State of South Carolina.  Next, that borrower completes a loan application, which TitleMax of South Carolina then immediately reviews.  The customer's vehicle is appraised on-site.  If the customer's loan is approved, TitleMax of South Carolina and the borrower execute a loan agreement in person at the store, which expressly and conspicuously states that it was governed by South Carolina law.  Once the required documents are executed, TitleMax of South Carolina retains a hard copy of the borrower's motor vehicle title in the originating TitleMax of South Carolina store.  This process has always been the same.[1]

---

[1] In some instances, when an appraisal is not necessary, a borrower can refinance a title secured loan via an online web portal.  To execute the loan documents for the refinance, the customer

26.     Next, borrowers receive their loan proceeds, and that happens in one of four ways.

27.     One option a borrower can elect is to receive a paper check that a TitleMax of South Carolina employee signs and hands to the borrower inside a TitleMax of South Carolina store.

28.     Beginning around 2021, a second option a borrower can choose is for a TitleMax of South Carolina employee to push funds onto the borrower's debit card through a process completed in the TitleMax of South Carolina store.

29.     Currently, two more options are available to South Carolina customers: a borrower may retrieve their funds through TitleMax of South Carolina's partnership with a third party, MoneyGram International, Inc., or a borrower can choose is to pick up a prepaid debit card that is activated at a TitleMax of South Carolina brick-and-mortar store.

30.     After loan origination concludes and funds are disbursed to the customer, TitleMax of South Carolina completes the ministerial act of securing its lien on the borrower's motor vehicle with the appropriate agency in the state where the motor vehicle is registered by submitting the necessary lien documentation.

31.     As the loan matures, borrowers make payments on their loans in one of three ways.  The first option available to borrowers is to make payments through debit card transactions that are processed in the physical TitleMax of South Carolina brick-and-mortar store where the loan originated.  Borrowers were also able to make payments through a mobile app until that application was sunsetted, and now they may make payments through a web portal.

---

must either have GPS location services turn on their phone to evidence they are in the state of South Carolina, or the customer must certify he or she is within the state of South Carolina.

The remaining option available to borrowers is for them to bring cash or a money order physically to the TitleMax of South Carolina store location where the loan originated.

32.    Where customers physically bring payments in-person to a TitleMax of South Carolina store, the funds are transferred to a bank branch near the store where the loan was originated.  It is believed that those bank branches that received cash deposits from TitleMax of South Carolina stores are and were always physically located inside South Carolina.  Over the phone payments made using debit cards are also processed in the TitleMax of South Carolina brick-and-mortar stores unless they are 91 days or more past due in which case a collections affiliate in Texas handles them.  These facts are true for all relevant times.

33.    Regardless of the methods in which payments were made, no payments on TitleMax of South Carolina loans were ever processed in Pennsylvania, sent to bank branches in Pennsylvania, or deposited with bank branches in Pennsylvania.

34.    Each of the aforementioned TitleMax of South Carolina procedures has been in effect at all times relevant for purposes of this action.

**TitleMax of South Carolina Lacks Contacts with Pennsylvania**

35.    TitleMax of South Carolina has always operated exclusively in South Carolina and has maintained a registered agent in South Carolina since first registering to do business in South Carolina.

36.    By contrast, TitleMax of South Carolina has never had any offices, employees, or agents in Pennsylvania and has never been registered to do business in Pennsylvania.

37.    In fact, TitleMax of South Carolina has ***never***:

        a.      advertised or marketed inside Pennsylvania;

        b.      intentionally advertised or marketed toward Pennsylvania consumers;

        c.      held a certificate or license to do business in Pennsylvania;

    d.     owned or leased property in Pennsylvania; or

    e.     used employees or agents to solicit Pennsylvania business in person.

38.     All TitleMax advertisements in South Carolina complied with South Carolina law and federal law.  No such advertisements were designed or intended to specifically target consumers from within Pennsylvania.

39.     Likewise, Pennsylvania consumers were never solicited or invited to travel to South Carolina to obtain services from TitleMax of South Carolina.

40.     In fact, Pennsylvania consumers who attempt to review TitleMax of South Carolina's products online are informed that loans are not available in their state.

41.     Despite these hurdles, some Pennsylvania residents opted to exercise their constitutional right to travel outside of Pennsylvania and into the territorial and sovereign borders of South Carolina to enter a brick-and-mortar TitleMax of South Carolina store.

42.     Only on these occasions would Pennsylvania consumers who were exercising their constitutionally-protected right to travel have been able at certain points in time to obtain loans from TitleMax of South Carolina within South Carolina.  Still, TitleMax of South Carolina only ever made, according to internal corporate records, approximately 120 loans between 2008 and the present to individuals who had a Pennsylvania address.  Notably, the Department seeks to regulate not only the aforementioned loans, but also the extremely small number of loans where a customer originated with a non-Pennsylvania address, but, after the loan had been originated and funded exclusively in South Carolina, moved to Pennsylvania and then claimed Pennsylvania residence status.

43.     What is also clear is that Pennsylvanians could not obtain loans from TitleMax of South Carolina over the internet.  The TitleMax website precluded TitleMax of South

Carolina from doing online business with consumers located physically inside Pennsylvania. Indeed, when a Pennsylvania consumer visits the TitleMax website and fills out the required information to "GET STARTED," the Pennsylvania consumer is informed, "Unfortunately, we do not have a product to offer you at this time.*  Please call us at 1-88-TITLEMAX if you have any questions."  *See* TitleMax, https://www.titlemax.com (last visited Aug. 12, 2024).  The asterisk text advises the borrower, "We don't do business in all states.  Customers may have to travel to a neighboring state to do business with us . . . "  *See id.*

44.    Moreover, as discussed above, to get money through an online loan with TitleMax of South Carolina over the internet, you must have a South Carolina address, and you must have GPS enabled to ensure you are physically located in the South Carolina.

45.    Notably, TitleMax of South Carolina never had a single brick-and-mortar store in Pennsylvania or in any state other than South Carolina.  Nor did it ever have any employees, corporate offices, or assets inside Pennsylvania.  TitleMax of South Carolina's policy prohibited solicitation of business from Pennsylvania residents and direct advertisements at Pennsylvania and had mechanisms in place to affirmatively bar Pennsylvania residents from attempting to do business with TitleMax of South Carolina other than in the scenarios in which Pennsylvanians traveled to one of TitleMax's brick-and-mortar stores in South Carolina.

46.    To the limited extent that TitleMax of South Carolina initiated collection or repossession activity with respect to Pennsylvania customers whose loans originated in South Carolina, such debt collection activity and enforcement of liens are not considered "doing business" under Pennsylvania law.  *See* 15 Pa. C.S. § 403(a)(8), (12); *see also Barton v. Portfolio Recovery Assocs., LLC*, Civil Action No. 2:20-cv-464, 2020 WL 4340167, at *3 (W.D. Pa. July 28, 2020) (holding that debt-collection activities in the state "statutorily do not constitute doing

business in Pennsylvania"); *WAMCO, XXV Ltd. v. DeSouza*, No. 4385 JULY TERM 2000, 2001 WL 1179424, at *5 (Pa. Commw. Ct. Apr. 3, 2001) (explaining that under 15 Pa. C.S. § 4122(a), conducting "collection activities in Pennsylvania is not doing business" in Pennsylvania).

### A History of the Pennsylvania Department's Interpretation and Enforcement of the LIPL and CDCA

47.     The Pennsylvania Secretary, through her agents in the Department, attempts to regulate TitleMax of South Carolina under the LIPL and CDCA for business activity that occurred exclusively in South Carolina.  But this attempt constitutes a deviation from the Department's own understanding and consequent interpretation of the reach of these two interlocking statutes and whether they extended to business conduct outside of the Commonwealth of Pennsylvania.

48.     The Department, by and through the Pennsylvania Secretary, administers and enforces the LIPL and CDCA, among other statutes and regulations.  *See* 41 Pa. C.S. § 506(b), (c) (LIPL); 7 Pa. C.S. § 6212 (CDCA).

49.     The LIPL and CDCA regulate the interest rates that may be charged on loans made in Pennsylvania.  *See* 7 Pa. C.S. § 5203.  Under the LIPL, the maximum interest rate on a Pennsylvania loan of $50,000 or less is 6% per year.  41 Pa. C.S. § 201.  Under the CDCA, for loans of $25,000 or less, a lender may charge an interest rate up to approximately 24% per year if licensed by the Department.  7 Pa. C.S. §§ 6203(a), 6213.  In sum, for loans made up to $25,000, an unlicensed lender can charge no more than 6% annual interest and a licensed lender can charge no more than approximately 24% annual interest.  The CDCA expressly states that it only governs "persons" engaged "***in this Commonwealth*** . . . in the business of ***negotiating or making loans*** or advances of money or credit."  7 P.a. C.S. § 6203(A) (emphasis added).

13

50.     Until July 26, 2008, the Secretary of the Department and the Department had, through a series of interpretive letters, interpreted the phrase "in this Commonwealth" as necessarily excluding out-of-state lenders without any officers or employees in Pennsylvania, such that entities licensed in states outside of Pennsylvania could lend to Pennsylvania consumers through the mail or over the internet.

51.     On July 26, 2008, however, without any statutory amendment by the legislature, "[t]he Department announced that engaging in nonmortgage consumer lending to Pennsylvania residents by any means, including by means of the internet or by mail, constitutes engaging in such business in this Commonwealth as contemplated by" the CDCA.  *Cash Am. Net of Nev., LLC v. Com., Dep't of Banking*, 8 A.3d 282, 286 (Pa. 2010) (internal quotations omitted) (upholding the Department's new interpretation as correct regarding only the "specified types of loans in" that case: "short-term 'pay-day' loans to Pennsylvania residents made over the Internet").  Defendant now contends that this reinterpretation of a nearly 100-year-old statute (without a statutory amendment authorizing it) allows the Department to regulate *any* out-of-state lender with no physical presence in Pennsylvania, even if they do not advertise to Pennsylvania consumers in any way.

52.     Even more incredibly, in 2009 litigation before the Commonwealth Court of Pennsylvania in the *Cash America* case that preceded the Pennsylvania *Cash America* Supreme Court decision, the Department took the position expressly with the court "that if a Pennsylvania resident physically travels to Nevada to effect a loan from Cash America, the CDCA does not apply."  *See Cash Am. Net of Nev., LLC v. Pa. Dep't of Banking*, 978 A.2d 1028, 2009 Pa. Commw. LEXIS 570, at *39 n.10 (Pa. Commonw. Ct. July 10, 2009) (Leavitt, J. dissenting).  Now, without advance warning, the Secretary conveniently flipflops and asserts contradictorily

14

that the CDCA applies where Pennsylvania consumers travel to TitleMax of South Carolina stores.  Such gamesmanship should not be countenanced.

53.    The first time that TitleMax of South Carolina learned about the Pennsylvania Secretary's intent to reverse the position taken with the Pennsylvania Commonwealth Court in *Cash America*, through her agents at the Department, was when TitleMax of South Carolina's affiliates in Georgia received in the mail a subpoena dated August 22, 2017.  This subpoena was directed to a generic, non-existent entity called, "TitleMax, TMX Finance | Family of Companies" (the "August 2017 Subpoena") at 15 Bull Street, Suite 200, Savannah GA 31401.

54.    It became clear from this August 2017 Subpoena that the Pennsylvania Secretary, through her agents at the Department, threatened to enforce the LIPL and the CDCA extraterritorially, even where title lenders never originated loans inside Pennsylvania.

55.    Even though TitleMax of South Carolina was not subject to (and is not subject to) the Department's authority, TitleMax of South Carolina nevertheless attempted to appease the Pennsylvania Secretary and her Department by addressing the Department's stated concerns and altering its business operations ***inside South Carolina*** with respect to Pennsylvania customers in four pivotal ways.

56.    First, after receiving this August 2017 Subpoena sent to a generic and non-existent entity at TitleMax of South Carolina's principal place of business, TitleMax of South Carolina, in specific response to that subpoena, voluntarily implemented a policy in South Carolina that prohibited the origination of loans to Pennsylvania residents, even when those Pennsylvania consumers came to TitleMax of South Carolina brick-and-mortar stores within the territorial borders of South Carolina seeking to do business with TitleMax of South Carolina under South Carolina law.  This business alteration deprived TitleMax of South Carolina brick-

and-mortar stores of revenue from visiting Pennsylvania residents, which in turn had an adverse impact on the business environment inside South Carolina and deleteriously impacted the State of South Carolina's tax revenue stream.

57.     Second, on information and belief, TitleMax of South Carolina implemented a policy to cease debt collection efforts with respect to loans made to Pennsylvania borrowers, even though each such loan was made inside the territorial borders of South Carolina.

58.     Third, on information and belief, TitleMax of South Carolina stopped the placement of all calls to Pennsylvania-based borrowers even with respect to "payment reminder" calls.

59.     Fourth, TitleMax of South Carolina implemented a policy to prohibit mailing collections into Pennsylvania in response to and immediately after receiving the August 2017 Subpoena.

60.     Of course, even with these changes, TitleMax of South Carolina could not avoid making loans to non-Pennsylvania customers who later moved to Pennsylvania and became Pennsylvania residents during the life of the loan.

61.     Despite TitleMax of South Carolina's voluntary changes, the Department did not relent in its efforts to regulate extraterritorially.  In fact, remarkably, the Pennsylvania Secretary, through her agents at the Department, filed a miscellaneous action in Pennsylvania state court to enforce the August 2017 Subpoena *against TitleMax of South Carolina* and its affiliates in other states, *even though TitleMax of South Carolina did not even appear on the face of the defective August 2017 Subpoena* that was addressed to a generic, non-existent entity.  *See Pennsylvania v. TitleMax of Del., Inc. et al.*, Docket No. 417 MD 2017.

62.     What is even more unimaginable, the Pennsylvania state court ordered the parties, **including TitleMax of South Carolina**, to comply. *See id.* Begrudgingly, TitleMax of South Carolina did so, even though it felt harassed by a regulatory body in a state where (i) it was not registered, did not do business, and had no property or employees; and (ii) it seemed unable to get a fair shake from that state's courts (given that a very obviously defective subpoena was **still enforced against it**, despite improper service and the document failing to even name TitleMax of South Carolina anywhere within its four corners).

## The Defendant's Specific Contacts with South Carolina Related to this Matter

63.     Unrestrained and emboldened by the Pennsylvania Commonwealth Court, the Pennsylvania Secretary, through her agents at the Department, has doubled- and tripled-down on her unbridled efforts to regulate TitleMax of South Carolina for business activity occurring **exclusively within South Carolina's territorial and sovereign borders.**

64.     For instance, on June 7, 2024, an agent of the Department mailed the June 2024 Subpoena to "Community Choice Financial Family of Brands | TitleMax; Attn: Legal Department" at 15 Bull Street, Suite 200, Savannah GA 31401.

65.     Like the August 2017 Subpoena, the "Community Choice Financial Family of Brands" is not a legal entity. Nor does TitleMax of South Carolina have a "Legal Department" situated within it.

66.     On that same day, the Department also e-mailed the June 2024 Subpoena to the law firm of Holland & Knight, predecessor counsel for TitleMax of South Carolina in the Pennsylvania miscellaneous action pertaining to enforcement of the August 2017 Subpoena.

67.     Holland & Knight, however, did not have authority from TitleMax of South Carolina to accept service of the June 2024 Subpoena and did not do so.

68.     Addressed to the non-existent entity "Community Choice Family of Brands," the June 2024 Subpoena commands "Community Choice Family of Brands" to produce documents and information on behalf of a generic entity styled "TitleMax."  The June 2024 Subpoena then defines "TitleMax" to encompass an array of distant affiliate entities of which TitleMax of South Carolina is one.

69.     Importantly, the June 2024 Subpoena was not served in a manner compliant with either Pennsylvania or South Carolina law—let alone, both.  Indeed, it was not domesticated in either South Carolina or in Georgia.

70.     Even though it is facially defective and not properly served, the June 2024 Subpoena seeks voluminous business records belonging to TitleMax of South Carolina and the other named entities pursuant to the Department's purported authority to investigate potential violations of the LIPL and the CDCA by activities occurring entirely outside of Pennsylvania.

71.     The June 2024 Subpoena seeks such documents for a seven-year period running from August 23, 2017, through the present.

72.     Shortly after issuing the June 2024 Subpoena, an agent of the Department issued an Order to Show Cause to, *inter alia*, TitleMax of South Carolina.

73.     On June 14, 2024, an agent of the Department attached the Order to Show Cause to an e-mail sent to Holland & Knight.  The face of the document identities multiple respondent entities of which TitleMax of South Carolina is one.

74.     Again, Holland & Knight did not have authority from TitleMax of South Carolina to accept service on its behalf and did not.

75.     On June 18, 2024, the Order to Show Cause arrived in the mail at 15 Bull Street, Suite 200, Savannah, GA 31401.  While this address is the principal place of business for

18

TitleMax of South Carolina, it was not addressed to TitleMax of South Carolina, and TitleMax of South Carolina did not receive a copy of a notice specifically addressed to it anywhere else either.

76.    Thus, again, the Order to Show Cause was not served on TitleMax of South Carolina (or the other TitleMax entities) in a manner compliant with either Pennsylvania or South Carolina law—let alone, both.

77.    Nevertheless, the Order to Show Cause demands that TitleMax of South Carolina answer and explain "why the Banking and Securities Commission ('Commission') should not impose" ***civil penalties that total more than $52.7 million for alleged violations of the LIPL and CDCA***—which allegedly arise out of loans made by the named entities to Pennsylvania customers.  Significantly, according to internal corporate records, only about 132 of the loans at issue were made by TitleMax of South Carolina (all of which were made when Pennsylvania consumers came to stores inside the borders South Carolina), and the Order to Show Cause makes no effort to identify why TitleMax of South Carolina could be liable for the full $52.7 million.  And glaringly, as previously noted, some of these loans were made to residents of other states who later moved into Pennsylvania during the life of the loan.

78.    The Pennsylvania Secretary's repeated and continuous efforts, through her agents at the Department, to regulate TitleMax of South Carolina over the past 7 years has caused TitleMax of South Carolina to continue its voluntary policy not to make loans to Pennsylvania consumers inside TitleMax of South Carolina brick-and-mortar stores inside South Carolina.  That business operational change hurts the South Carolina lending market, hurts the South Carolinians employed by TitleMax of South Carolina, hurts the South Carolina tax revenue stream, and ultimately hurts the State of South Carolina itself.

79.     Her repeated and continuous efforts to regulate TitleMax of South Carolina over the past 7 years has also caused TitleMax of South Carolina to forego repossessing vehicles securing loans originated in South Carolina, where the repossessions would have to occur inside Pennsylvania.  That business operational change, too, hurts the South Carolina lending marketing and South Carolinians employed by TitleMax of South Carolina, hurts the South Carolina tax revenue stream, and ultimately harms the State of South Carolina itself.

80.     In sum, the June 2024 Subpoena and Order to Show Cause seek to investigate and regulate conduct that occurred entirely outside of Pennsylvania.  The June 2024 Subpoena and Order to Show Cause were purposely directed at a South Carolina-based entity, business conducted in South Carolina, and contractual relationships formed in South Carolina.

81.     TitleMax of South Carolina's failure to respond to the Order to Show Cause can result in entry of a default order and finding that all allegations of fact are deemed admitted.

82.     As a result of the Defendant's extra-territorial legal threats, investigative activities, and regulatory efforts, TitleMax of South Carolina must either submit to the Defendant's jurisdiction by producing documents and answers responsive to the Defendant's extra-territorial June 2024 Subpoena or to initiate an action and seek this Court's protection from the Defendant's unconstitutional overreach and abuses.

### The Pennsylvania Secretary's Voluminous Contacts with South Carolina

83.     The Defendant oversees the Department.  The Department is an executive Pennsylvania state agency, and the Secretary is a member of the Governor's cabinet.

84.     The June 2024 Subpoena and Order to Show Cause are not the only time the Secretary of the Department has attempted to regulate conduct and lending activity originating solely within the territorial borders of South Carolina.  As discussed previously, in 2017 the

54947886 v1

Department through the Pennsylvania Secretary issued the First Subpoena to "TitleMax, TMX

Finance | Family of Companies."  TitleMax of South Carolina complied with that subpoena.

85.     Moreover, the Defendant, in her official capacity as Secretary of the Department

and as a representative of Pennsylvania, has extensive contacts in South Carolina, which include

but are not limited to the following:

      a.     communications into South Carolina via mail, phone, the internet, e-mail,

          and other communication channels;

      b.     threatened enforcement of Pennsylvania laws against South Carolina

          residents and businesses;

      c.     membership in conferences and groups that engage in nationwide

          regulatory efforts, including regulatory efforts targeted at South Carolina;

      d.     extensive cooperation with South Carolina state agencies and other arms

          of the South Carolina government;

      e.     solicitation of complaints and grievances from South Carolina residents;

          and

      f.     advertising and publicizing of regulatory and legal actions taken against

          South Carolina residents and businesses.

86.     Likewise, the Defendant routinely transmits communications to South Carolina

and its residents using the internet.  For example, the Defendant maintains a highly interactive

website called the "Department of Banking and Securities" that advertises and publicizes its

enforcement actions.  *See* Dep't of Banking & Secs., *2024 Enforcement Orders*, (last visited

Aug. 12, 2024).  This website is accessible from South Carolina.

87.     While most of the advertised enforcement orders concern Pennsylvania residents, the Defendant also advertises enforcement orders taken against *out-of-state* residents, such as TitleMax of South Carolina.  Indeed, its website publicizes the fact that it issued an Order to Show Cause to "TitleMax of South Carolina, Inc." on June 14, 2024.

88.     The Department's website solicits complaints and allows South Carolina residents to interact with the website to file a complaint.  Dep't of Banking & Secs., *Filing a Complaint*, https://www.dobs.pa.gov/Consumers/Pages/File-a-Complaint.aspx (last visited Aug. 12, 2024).

89.     The Department's website asks users, no matter which state they reside in, to file a complaint online (a) by calling "1.800.PA.BANKS"; (b) by mailing a complaint to the Department's headquarters in Harrisburg, Pennsylvania; or (c) by sending a fax.  *See id.*

90.     The website emphasizes that "[c]omplaints are important as they allow DoBS to identify patterns of unfair or deceptive practices that may result in further action."  *See id.*  The "Filing a Complaint" page, which solicits complaints, does not limit eligible complainants to Pennsylvania residents or former Pennsylvania residents.  *See id.*

91.     The Pennsylvania Attorney General has also taken steps to solicit South Carolina residents through operation of a website.  For example, in a press release issued on October 14, 2022, the Pennsylvania Attorney General's Office advertised an "important victory" over TitleMax of South Carolina's affiliates in separate litigation in Delaware that did not involve TitleMax of South Carolina.  *See* Pa. Att'y Gen., *AG Shapiro Gets $1.6 Million Back for Consumers Issued Illegal Car Title Loans*, https://www.attorneygeneral.gov/taking-action/ag-shapiro-gets-1-6-million-back-for-consumers-issued-illegal-car-title-loans/ (last visited Aug. 12, 2024).  Following this press release, the then-Pennsylvania Attorney General invited

22

"[c]onsumers [including in South Carolina] who believe they have been taken advantage of by a similar car title lender [to] file a consumer complaint online or contact the Office of Attorney General by calling 1-800-441-2555 or by emailing scams@attorneygeneral.gov." *See id.*

92.     This press release even included a hyperlink that directs consumers, including consumers in South Carolina, to a webpage titled "Submit a Complaint." *See* Pa. Att'y Gen., *Submit a Complaint*, https://www.attorneygeneral.gov/submit-a-complaint/ (last visited Aug. 12, 2024). This webpage is highly interactive and permits residents from South Carolina to file complaints, even if they do not reside in (and have never resided in) Pennsylvania. This webpage contains no restrictions or limitations on the geographic location of a complainant, nor does it discourage South Carolina residents from filing complaints.

93.     Pennsylvania's outreach to South Carolina residents through its suite of interactive websites, and its solicitation of "complaints" from South Carolina residents about South Carolina businesses is just one way in which the Defendant, her agency, and her State have developed substantial connections to South Carolina and have attempted to influence business activities here.

94.     As a result of its solicitation, the Department received complaints about TitleMax of South Carolina and/or its affiliates that involved business transactions that occurred exclusively within South Carolina and involved individuals who were not (and have never been) Pennsylvania residents.

95.     Moreover, Pennsylvania—through its regulatory agencies and law enforcement officials—has expressed a strong desire to regulate extra-territorial business activity, including activity in South Carolina. For example, while he was Pennsylvania's Attorney General, Pennsylvania Governor Josh Shapiro stated in 2022 that certain defendants "thought they could

evade Pennsylvania laws" because they were "based in Delaware and Florida."  *See* Pa. Att'y

Gen., *AG Shapiro Gets $1.6 Million Back for Consumers Issued Illegal Car Title Loans*,

https://www.attorneygeneral.gov/taking-action/ag-shapiro-gets-1-6-million-back-for-consumers-

issued-illegal-car-title-loans/ (last visited Aug. 12, 2024).  Attorney General Shapiro went on to

proclaim, "But ***I don't care where you are***, if you exploit Pennsylvania consumers, ***you're going***

***to hear from my office***."  *Id.* (emphasis added).  Attorney General Shapiro explained that prior

settlements with title loan companies were partially intended to "put[] other bad actors on

notice," no matter "where [they] are."  *Id.*  Governor Shapiro was the Attorney General when the

August 2017 Subpoena was issued.

96.      There are innumerable other continuous and ongoing relationships and

partnerships between the Department and South Carolina as well.  For instance, the Defendant

and the Department are also members of the Conference of State Bank Supervisors ("CSBS").

CSBS promotes cooperation between and engagement among Defendant and her counterpart in

South Carolina at the State Board of Financial Institutions.

97.      CSBS "serves as a forum for collaborating and developing policies that

strengthen financial regulation."  Conference of State Bank Supervisors, *2022 Annual Report*, at

2, https://www.csbs.org/annual-reports-financials (last visited Aug. 12, 2024).

98.      On information and belief, CSBS also hosts regular events at locations around

the country, including some in South Carolina, at which Defendant or members of her office

meet with representatives from the South Carolina State Board of Financial Institutions.  *See*

Conference of State Bank Supervisors, *Calendar of Events*, https://www.csbs.org/calendar-

events (last visited Aug. 12, 2024).  These events have included three events in the last six years

alone.  Conference of State Bank Supervisors, *Previous Events*, https://www.csbs.org/previous-events (last visited Aug. 12, 2024).

99.     Defendant's membership in CSBS results in substantial contacts with South Carolina.  These contacts come in many forms, such as the following:

a.     The Defendant has access to CSBS's Nationwide Multistate Licensing System (NMLS), which is an "online licensing, registration and supervisory platform." Conference of State Bank Supervisors, *2022 Annual Report*, at 5, https://www.csbs.org/annual-reports-financials (last visited Aug. 10, 2024).  This system aids in "Networked Supervision," which allows the states (including Pennsylvania and South Carolina) to "actively communicate as a ***federated unit***, sharing secure information instantly and with all regulator stakeholders simultaneously."  Conference of State Bank Supervisors, *Networked Supervision*, https://www.csbs.org/networked-supervision (last visited Aug. 10, 2024). TitleMax of South Carolina believes and understands, and therefore alleges, that Defendant utilizes NMLS to share information with regulatory counterparts in South Carolina.

b.     The Defendant participates in CSBS's State Examination System (SES). Conference of State Bank Supervisors, *2022 Annual Report*, at 9, https://www.csbs.org/annual-reports-financials (last visited Aug. 12, 2024).  SES allows the Defendant to process consumer complaints and to "manage consumers complaints in a collaborative, networked manner that preserves state control over information sharing."  *Id.*  Defendant utilizes SES to share information with regulatory counterparts in South Carolina.

c.    The Defendant participates in CSBS's "One Company, One Exam" program, which is intended to "enabl[e] state coordination."  Conference of State Bank Supervisors, *2022 Annual Report*, at 10, https://www.csbs.org/annual-reports-financials (last visited Aug. 12, 2024).

100.    The Department is also a member of other similar groups, including the North American Securities Administrators Association, the National Association of Consumer Credit Administrators (which is led by Jim Copeland, the Chief Enforcement Attorney within the Legal Division of the South Carolina Department of Consumer Affairs), and the Money Transmitter Regulators Association.

101.    The Defendant has requested information from South Carolina officials in the course of carrying out her official duties.

102.    The Defendant has provided information to South Carolina officials in the course of carrying out her official duties.

103.    Beyond CSBS, the Defendant (or her office) is a party to a panoply of multi-state agreements that include South Carolina.  *See* Conference of State Bank Supervisors, *Cooperative Agreements*, https://www.csbs.org/cooperative-agreements (last visited Aug. 12, 2024).  These nationwide cooperative agreements obligate the Defendant to "cooperate" and "communicate" with her counterparts in South Carolina regarding multi-state banks and other multi-state financial institutions.  *E.g.*, Conference of State Bank Supervisors, *Nationwide Cooperative Agreement* (Revised Dec. 9, 1997), https://www.csbs.org/cooperative-agreements (last visited Aug. 12, 2024).  In addition to these cooperative agreements, the Defendant (or the Department) is also a party to a range of "information sharing" agreements that require or encourage multi-state communications, including communications with South Carolina.

104.    Moreover, the Department or the State of Pennsylvania, including the Pennsylvania Attorney General's office, routinely participates in the prosecution of multi-state Attorney General investigations and lawsuits that target South Carolina companies.  Most recently, the Pennsylvania Attorney General's office announced a $49.5 million negotiated multi-state settlement with a South Carolina-based company that was negotiated alongside the South Carolina Attorney General.

### COUNT I
### VIOLATION OF 42 U.S.C. § 1983
### UNDER THE DORMANT COMMERCE CLAUSE

105.    TitleMax of South Carolina incorporates the allegations set forth above as if fully set forth herein.

106.    Known as the "Commerce Clause," Article I, Section 4 of the U.S. Constitution provides, "The Congress shall have Power . . . to regulate Commerce with foreign Nations, *and among the several States* . . . ."  U.S. art. I, § 4 (emphasis added).

107.    The U.S. Supreme Court has held that "the Commerce Clause not only vests Congress with the power to regulate interstate trade; the Clause also 'contains a further, negative command,' one effectively forbidding the enforcement of 'certain state economic regulations even when Congress has failed to legislate on the subject."  *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 368 (2023) (quoting *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175 (1995)).

108.    The Supreme Court has further held as follows:

Taken together, our cases concerning the extraterritorial effects of state economic regulation stand at a minimum for the following propositions: First, the Commerce Clause precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State, . . . .   Second, a statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting

27

State's authority and is invalid regardless of whether the statutes' extraterritorial reach was intended by the legislature. The critical inquiry is whether the practical effects of the regulation is to control conduct beyond the boundaries of the State. Third, the practical effect of the statute must be evaluated not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation. Generally speaking, the Commerce Clause protects against inconsistent legislation arising from the projection of one state's regulatory regime into the jurisdiction of another State. And specifically, the Commerce Clause dictates that no State may force an out-of-state merchant to seek regulatory approval in one State before undertaking a transaction in another.

*Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336-37 (1989).

109. 42 U.S.C. § 1983 creates a civil cause of action where any person "under color of any statute, ordinance, regulation, custom, or usage, of any State" denies any person within the United States of a constitutional right or privilege. 42 U.S.C. § 1983.

110. The Pennsylvania Secretary, in her official capacity as the chief executive and administrative officer of the Department, is a "person" for purposes of 42 U.S.C. § 1983.

111. The Pennsylvania Secretary, in her official capacity as the chief executive and administrative officer of the Department, issued the June 2024 Subpoena and Order to Show Cause under color of Pennsylvania law.

112. As described in greater detail above, TitleMax of South Carolina has no offices or employees in Pennsylvania, does not conduct any business in Pennsylvania, and does not advertise in Pennsylvania. Every one of the loans at issue in the Order to Show Cause and that are the subject of the June 2024 Subpoena were originated inside the territorial and sovereign boundaries of South Carolina—and therefore "wholly outside" the territorial boundaries of Pennsylvania.

113. Therefore, the Defendant, through her agents in the Department, is attempting to regulate "commerce that takes place wholly outside of [Pennsylvania]'s borders," which "the

Commerce Clause precludes." *See Healy*, 491. U.S. at 336; *Midwest Title Loans, Inc. v. Mills*, 593 F.3d 660 (7th Cir. 2010) (applying *Healy* to invalidate Indiana's regulation of Illinois-based automobile title lender in similar circumstances); *see also Ass'n for Accessible Meds. v. Frosh*, 887 F.3d 664, 667 (4th Cir. 2018) ("[A] State may not regulate commerce occurring wholly outside of its borders.").

114.    Put simply, the Department is attempting to reach beyond the bounds of the Commonwealth of Pennsylvania to regulate applicable interest rates in the State of South Carolina, even though the permissible interest rates in the State of South Carolina fall squarely within the law-making authority, discretion, and prerogative of the South Carolina General Assembly.

115.    Accordingly, the Defendant's efforts to regulate TitleMax of South Carolina under the LIPL and CDCA violate the Dormant Commerce Clause embedded at Article I, Section 8 of the U.S. Constitution.  For that reason, declaratory and permanent injunctive relief should be entered.  *See* 42 U.S.C. § 1983.  In addition, an award of attorney's fees and costs should be entered against the Defendant as warranted and appropriate.  *See* 42 U.S.C. § 1988.

**COUNT II**
**VIOLATION OF 42 U.S.C. § 1983**
**UNDER THE FOURTEENTH AMENDMENT'S DUE PROCESS CLAUSE**

116.    TitleMax of South Carolina re-alleges and incorporates the allegations set forth above as if fully set forth herein.

117.    The Fourteenth Amendment to the U.S. Constitution guarantees, "No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ."  U.S. Const. amend. XIV.

54947886 v1

118.     By issuance of the June 2024 Subpoena and Order to Show Cause, the Pennsylvania Secretary attempts to regulate commercial activity that takes place wholly outside the Commonwealth of Pennsylvania.

119.     As described in greater detail above, TitleMax of South Carolina has no offices or employees in Pennsylvania, does not conduct any business in Pennsylvania, and does not advertise in Pennsylvania.

120.     The issuance of the June 2024 Subpoena and Order to Show Cause deprives TitleMax of South Carolina of its rights under the Due Process Clause embedded within the Fourteenth Amendment to the United States Constitution, which provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.

121.     "The Fourteenth Amendment's Due Process Clause limits a state's power to exercise jurisdiction over a" company who is not a resident in the state.  *Ford Motor Co. v. Mont. Eighth Jud. Dist.*, 592 U.S. 351, 358 (2021).  Where a state's "assertion of jurisdiction exposes defendants to the State's coercive power, it is subject to review for compatibility with the Fourteenth Amendment's Due Process Clause."  *Bristol-Myer Squibb Co. v. Super. Ct. of Cal.*, 582 U.S. 255, 261 (2017) (citations and quotation marks omitted).  Furthermore, "even if the defendant would suffer minimal or no inconvenience from being forced to litigate before the tribunals of another State; even if the forum State has a strong interest in applying its law to the controversy; even if the forum State is the most convenient location for litigation, the Due Process Clause, acting as an instrument of interstate federalism, may sometimes act to divest the State of its power to render a valid judgment."  *Id.* (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 294 (1980)).

122.    TitleMax of South Carolina is not incorporated in Pennsylvania, does not have its principal place of business in Pennsylvania, and is not licensed or registered to do business in Pennsylvania.  TitleMax of South Carolina is therefore not "at home" in Pennsylvania.

123.    And as described in greater detail above, TitleMax of South Carolina has no offices or employees in Pennsylvania, does not conduct any business in Pennsylvania, and does not advertise in Pennsylvania.  Every one of the loans at issue in the Order to Show Cause and that are the subject of the June 2024 Subpoena were originated inside the territorial and sovereign boundaries of South Carolina—and therefore "wholly outside" the territorial boundaries of Pennsylvania.  Given TitleMax of South Carolina's lack of contact with Pennsylvania, the Department's attempt to apply Pennsylvania law—including LIPL and CDCA—offends the "traditional notions of fair play and substantial justice" assured by the Due Process Clause.  *See Int'l Shoe v. Washington*, 326 U.S. 310, 316 (1945).

124.    Consequently, the threatened extraterritorial imposition of Pennsylvania law on TitleMax of South Carolina violates the Due Process Clause.  *See id.* (explaining that the Due Process Clause requires "certain minimum contacts with [the state]" such that the exercise of personal jurisdiction "does not offend 'traditional notions of fair play and substantial justice.'"); *see also Silverman v. Berkson*, 661 A.2d 1266 (N.J. 1994) (holding that the Due Process Clause bars a state agency from enforcing a subpoena against an out-of-state entity that does not have sufficient "minimum contacts" with the state).  It is, indeed, anathema to South Carolina's sense of sovereign rule.  *See* S.C. Code Ann. § 1-1-10 ("The sovereignty and jurisdiction of this State extends to all places ***within its boundaries*** . . . ."); *see also Robertson*, 364 S.C. at 157 (holding that "state statutes have no extraterritorial effect" inside South Carolina) (citing *Ex parte First Pa. Banking & Tr. Co.*, 247 S.C. 506 (1966)).

31

125.    In addition, under the U.S. Supreme Court's due process jurisprudence, "A State cannot punish a defendant for conduct that may have been lawful where it occurred." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 421 (2003). Moreover, since "[a] State does not acquire power or supervision over the internal affairs of another State merely because the welfare and health of its own citizens may be affected when they travel to that State," a state's violation of this principle violates the Fourteenth Amendment's Due Process Clause. *See Bigelow v. Virginia*, 472 U.S. 797, 811, 821-22 (1975).

126.    Accordingly, the Defendant's application of Pennsylvania law to TitleMax of South Carolina, a business that operates exclusively outside of Pennsylvania, that has no employees in Pennsylvania, that has no stores in Pennsylvania, that is not "at home" in Pennsylvania, and that originates no loans in Pennsylvania would offend substantial notions of "fair play and substantial justice" in violation of the Fourteenth Amendment to the U.S. Constitution. For that reason, declaratory and permanent injunctive relief should be entered. *See* 42 U.S.C. § 1983. In addition, an award of attorney's fees and costs should be entered against the Defendant as warranted and appropriate. *See* 42 U.S.C. § 1988.

## <u>COUNT III</u>
## VIOLATION OF 42 U.S.C. § 1983
## UNDER THE FULL FAITH AND CREDIT CLAUSE OF THE U.S. CONSTITUTION

127.    TitleMax of South Carolina re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint.

128.    The Full Faith and Credit Clause in Article IV of the U.S. Constitution guarantees, "Full Faith and Credit shall be given in each State to the public Acts, Record, and judicial Proceedings of every other State." U.S. art. IV, § 1. Under the Full Faith and Credit

Clause, each state must give "Full Faith and Credit" to "the public Acts" of "every other State," such as other states' statutes. *See Franchise Tax Bd. v. Hyatt*, 578 U.S. 171, 178-79 (2016).

129.    As relevant here, South Carolina has adopted the Uniform Interstate Depositions and Discovery Act ("UIDDA"). *See* S.C. Code § 15-47-100 *et seq.* The South Carolina UIDDA statute requires that those from outside of South Carolina wishing to serve a subpoena issued by a foreign jurisdiction on an entity located inside South Carolina must domesticate the subpoena by submitting "a foreign subpoena to the clerk of court of the county in which discovery is sought to be conducted in this State." S.C. Code § 15-47-120(A). And South Carolina's UIDDA provides that a recipient of a domesticated subpoena within South Carolina has the right to move to quash, narrow, or otherwise challenge any such legal process in its home courts. *See id.* at § 15-47-150.

130.    By the same token, Pennsylvania has adopted a virtually identical UIDDA statute in the Commonwealth of Pennsylvania. *See* 42 Pa. C.S. § 5331 *et seq.* Just like South Carolina's law, Pennsylvania has required domestication of a foreign subpoena through a Pennsylvania public official: "[t]o request issuance of a subpoena under this section, a party must submit a foreign subpoena to a prothonotary in the jurisdiction in which the person who is the subject of the order resides, is employed or regularly transacts business in person." 42 Pa. C.S. §§ 5333, 5335(a). Pennsylvania's UIDDA, exactly like South Carolina's UIDDA, permits a recipient of a domesticated foreign subpoena inside Pennsylvania to move to quash, narrow, or otherwise challenge the legal process in Pennsylvania courts. 42 Pa. C.S. § 5337(a).

131.    Despite the existence of the South Carolina UIDDA statute and despite Pennsylvania having a virtually identical statute with which it would expect those serving foreign subpoenas inside Pennsylvania to comply, the Department did not honor South

Carolina's UIDDA statute and domesticate the June 2024 Subpoena in South Carolina pursuant to S.C. Code 15-47-120(A).

*132.*    The Department's failure to do so constitutes a "constitutionally impermissible 'policy of hostility' to the public Acts of a sister state."  *See Hyatt*, 578 U.S. at 179.

*133.*    Accordingly, the Defendant has violated the Full Faith and Credit Clause of the U.S. Constitution through her failure to abide by the "public Acts," statutes, and judicial decrees of South Carolina.  U.S. Const. art. IV, § 1; *Hyatt*, 578 U.S. at 179.  For that reason, declaratory and permanent injunctive relief should be entered.  *See* 42 U.S.C. § 1983.  In addition, an award of attorney's fees and costs should be entered against the Defendant as warranted and appropriate.  *See* 42 U.S.C. § 1988.

**COUNT IV**
**VIOLATION OF 42 U.S.C. § 1983**
**UNDER THE FOURTEENTH AMENDMENT'S EQUAL PROTECTION CLAUSE**

134.    TitleMax of South Carolina re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint.

135.    The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution provides, "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

136.    In the event Pennsylvania is deemed to have jurisdiction over TitleMax of South Carolina, the enforcement of the LIPL and CDCA against TitleMax of South Carolina denies TitleMax of South Carolina equal protection of the laws in violation of the Equal Protection Clause.

137.    As discussed previously, Pennsylvania has adopted a UIDDA statute in the Commonwealth of Pennsylvania that is virtually identical to South Carolina's UIDDA statute.

34

*See* 42 Pa. C.S. § 5331 *et seq.* Under Pennsylvania's UIDDA, Pennsylvania has required

domestication of a foreign subpoena through a Pennsylvania public official: "[t]o request

issuance of a subpoena under this section, a party must submit a foreign subpoena to a

prothonotary in the jurisdiction in which the person who is the subject of the order resides, is

employed or regularly transacts business in person." 42 Pa. C.S. §§ 5333, 5335(a). It follows

then that other "person[s] within [Pennsylvania's] jurisdiction" would receive the "protection"

afforded by the UIDDA statute.

138.    Yet, by not honoring South Carolina's UIDDA, the Defendant, through agents at

the Department, is not affording TitleMax of South Carolina, another "person" who the

Department claims is "within its jurisdiction," the same "protection" afforded by UIDDA.

139.    Accordingly, the Department is discriminating against nonresident companies,

like TitleMax of South Carolina, and denying such nonresident companies equal protection of

the laws. There is no rational basis for such governmental discrimination and to deny TitleMax

of South Carolina the protections guaranteed by UIDDA.

140.    Accordingly, the Defendant has violated the Equal Protection Clause embedded

in the Fourteenth Amendment to the U.S. Constitution. U.S. Const. amend. XIV. For that

reason, declaratory and permanent injunctive relief should be entered. *See* 42 U.S.C. § 1983. In

addition, an award of attorney's fees and costs should be entered against the Defendant as

warranted and appropriate. *See* 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

WHEREFORE, TitleMax of South Carolina respectfully seeks the following relief:

a.          Enter a judgment declaring that the Commerce Clause, Due Process

Clause, Full Faith and Credit Clause, and Equal Protection Clause of the U.S. Constitution render

the Defendant's June 2024 Subpoena null and void;

54947886 v1

b.        Enter a judgment declaring that the Commerce Clause, Due Process Clause, Full Faith and Credit Clause, and Equal Protection Clause of the U.S. Constitution bar any further action on the Order to Show Cause;

c.        Enter a permanent injunction restraining the Pennsylvania Secretary—as well as her officers, agents, servants, employees, and attorneys—from enforcing the June 2024 Subpoena;

d.        Enter a preliminary and permanent injunction restraining the Pennsylvania Secretary—as well as her officers, agents, servants, employees, and attorneys—from enforcing the Order to Show Cause;

e.        Preliminarily and permanently enjoining the Defendant, her officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction from initiating any action to enforce the June 2024 Subpoena, to enforce the Order to Show Cause, or to further regulate TitleMax of South Carolina's business practices;

f.        An award to Plaintiff of its reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

g.        Any and all other such relief as the Court may deem appropriate.

Respectfully submitted,

 s/Celeste T. Jones
Celeste T. Jones (Fed. ID # 2225)
Tracey Green (Fed. ID # 6644)
**BURR & FORMAN LLP**
1221 Main Street, Suite 1800
Columbia, SC 29201
Tele: (803) 799-9800
Fax: (803) 753-3278
CTJones@burr.com
tgreen@burr.com

Robert A. Angle (*pro hac vice motion forthcoming*)
Ryan J. Strasser (*pro hac vice motion forthcoming*)
Timothy L. McHugh (*pro hac vice motion forthcoming*)
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
1001 Haxall Point, 15th Floor
Richmond, VA 23219
Tele: (804) 697-1200
Fax: (804) 697-1290
robert.angle@troutman.com
ryan.strasser@troutman.com
tim.mchugh@troutman.com

*Counsel to Plaintiff TitleMax of South Carolina, Inc.*

Columbia, SC

August 13, 2024

54947886 v1