# EXHIBIT 2

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Commonwealth of Pennsylvania          :
Department of Banking and Securities,  :
                          Petitioner    :
                                        :        No. 417 M.D. 2017
              v.                        :        Heard: July 27, 2022
                                        :
Titlemax of Delaware, Inc.              :
Titlemax of Ohio, Inc.                  :
Titlemax of Virginia, Inc.             :
Titlemax of South Carolina, Inc.       :
Titlemax.com                            :
Titlemax Funding, Inc.                  :
And all successors or predecessors in   :
interest, affiliates, subsidiaries, or  :
parent companies, however named,        :
                         Respondents     :

**BEFORE:**    **HONORABLE RENÉE COHN JUBELIRER**, President Judge

**OPINION NOT REPORTED**

**MEMORANDUM OPINION BY**
**PRESIDENT JUDGE COHN JUBELIRER**      FILED: February 22, 2023

     Before the Court is Petitioner, the Commonwealth of Pennsylvania, Department of Banking and Securities' (Department), Amended Petition for Review to Enforce an Investigative Subpoena (Amended Petition). The Department seeks an order from this Court directing Respondents (collectively "Titlemax") to comply with certain portions of an investigative subpoena issued to Titlemax on August 22, 2017. Following a hearing on the Department's Amended Petition, the Court grants the Department's request to enforce the subpoena in accordance with the following opinion.

1

## Background & Procedural History

The Department is the executive agency authorized to regulate financial services, including the administration and enforcement of the Consumer Discount Company Act (CDCA)[1] and what is commonly known as the Loan Interest Protection Law (LIPL).[2]  Together, the CDCA and LIPL authorize the Department to regulate licensed and unlicensed lenders providing loans to citizens of the Commonwealth.  *See* Sections 3 and 13 of the CDCA, 7 P.S. §§ 6203, 6213, and Section 201(a) of the LIPL, 41 P.S. § 201(a).[3]  Titlemax is an organization that offers loans to borrowers secured by the title to the borrowers' motor vehicles.  Titlemax does not have any brick-and-mortar offices in Pennsylvania and is not licensed by the Department to lend money or service loans in Pennsylvania.

In 2008, the Department issued a "Notice to those Engaging or Considering Engaging in Nonmortgage Consumer Lending to Pennsylvania Residents." Department's Hearing Ex. 15 (2008 Notice).  Therein, the Department advised that it was changing its position regarding the application of Pennsylvania's usury laws to lending entities that do not have an office or physical presence in the Commonwealth.  (*Id.* at 1.)  The 2008 Notice explained:

> As a matter of background, the Department previously took the position that a nondepository entity that did not have any offices of any kind in Pennsylvania or people physically present in this Commonwealth acting as principal, employee, agent or broker was not "in this Commonwealth" as that term is used in section 3.A of the CDCA[, 7 P.S. § 6203]. Thus, under the prior position, such an entity would not be required to obtain a license under the CDCA to originate nonmortgage consumer loans by means of the Internet or mail to

---

[1] Act of April 8, 1937, P.L. 262, *as amended*, 7 P.S. §§ 6201-6219.

[2] Act of January 30, 1974, P.L. 13, *as amended*, 41 P.S. §§ 101-605.

[3] These sections limit lenders that are not licensed by the Department to charge a maximum annual interest rate of 6 percent per annum to Pennsylvania residents.

residents of this Commonwealth[]in which the charges exceeded 6% simple interest per annum, provided that the entity was licensed or otherwise authorized under the entity's home state law to engage in this type of lending activity. However, with the prevalence of Internet-based lending activity, it has become clear to the Department that the prior position has resulted in Pennsylvania consumers being exposed to the very lending practices that the CDCA was enacted to protect them from.

Based upon the foregoing, the Department is convinced that a change in policy is warranted, and licensing under the CDCA should be required for all nondepository entities engaging in nonmortgage consumer lending to Pennsylvania residents in which the charges exceed 6% simple interest per annum. This will provide Pennsylvania consumers with the protections available under the CDCA regardless of whether lenders are located in Pennsylvania or other states. Therefore, the Department's prior position regarding the licensing requirements for out-of-State consumer lenders under the CDCA is discontinued and any supportive Department precedent regarding the prior position will no longer be followed. The licensing under the CDCA for nondepository entities is now required to engage in nonmortgage lending to Pennsylvania residents in which the charges exceed 6% simple interest per annum by any means, including by mail or by means of the Internet.

(*Id.* at 1-2.)

In line with this new position, the Department began to investigate certain online lending entities that it believed were engaging in unlicensed lending with Pennsylvania consumers.

On August 22, 2017, following an investigation into Titlemax, the Department issued an investigative subpoena (2017 Subpoena or Subpoena) seeking the production of certain documents and information relating to Titlemax's lending practices with Pennsylvania residents.  (*See* Amended Petition, Ex. A.)  The Subpoena sought to obtain, among other things, loan agreements between Titlemax and Pennsylvania residents, records of payments from Pennsylvania residents to Titlemax, and records of repossessions of vehicles located in Pennsylvania in an

3

effort to determine whether Titlemax was complying with the provisions of the CDCA and LIPL as they relate to unlicensed lenders. *Id.* Titlemax responded to the 2017 Subpoena by initiating an action in federal court in Delaware (Delaware District Court), asserting that the Department's attempt to apply the CDCA and LIPL to Titlemax violated the Commerce Clause of the United States Constitution. U.S. Const., art. I § 8, cl 3 ("Congress shall have Power … To regulate Commerce … among the several States[.]").

Shortly thereafter, on September 22, 2017, the Department filed a petition for review seeking to enforce the 2017 Subpoena (Enforcement Petition) in this Court. On November 16, 2017, Titlemax removed the Department's Enforcement Petition from this Court to the United States District Court for the Middle District of Pennsylvania (Middle District) claiming that the Middle District had original diversity jurisdiction pursuant to 28 U.S.C. § 1332 (diversity of citizenship). Ultimately, the parties agreed to stay the Enforcement Petition pending in the Middle District during the ongoing litigation in the Delaware District Court, which was proceeding through mediation. Mediation in the Delaware District Court ultimately failed, and on June 10, 2019, the parties agreed to lift the stay of the case pending in the Middle District. There, the Department argued that the Enforcement Petition should be remanded to this Court for purposes of adjudicating the merits. By opinion and order dated January 10, 2020, the Middle District agreed with the Department and remanded the Enforcement Petition to this Court. (Amended Petition, Ex. B.)

Meanwhile, in the Delaware District Court, the parties filed cross-motions for summary judgment on the constitutionality of the Department's application of the CDCA and LIPL to Titlemax via the 2017 Subpoena. On December 7, 2020, the Delaware District Court granted summary judgment in favor of Titlemax and against

4

the Department, holding "the Department's attempt to apply its usury laws to the loans issued by Title[m]ax violate [*sic*] the Commerce Clause." *See TitleMax of Del., Inc. v. Weissmann*, 505 F. Supp. 3d 353, 360 (D. Del. 2020).

The Department appealed, and on January 24, 2022, the Third Circuit Court of Appeals reversed, explaining that "Pennsylvania has a strong interest in prohibiting usury. Applying Pennsylvania's usury laws to Titlemax's loans furthers that interest, and any burden on interstate commerce from doing so is, at most, incidental. Pennsylvania may therefore investigate and apply its usury laws to Titlemax without violating the Commerce Clause." *See TitleMax of Del, Inc. v. Weissman*, 24 F.4th 230, 241 (3d Circ. 2022) (Third Circuit Decision). Accordingly, the Third Circuit directed the Delaware District Court to enter judgment in favor of the Department. (Amended Petition, Ex. D.)

### Department's Amended Petition

On March 31, 2022, the Department filed the Amended Petition and a motion asking this Court to reinstate proceedings for enforcement of the 2017 Subpoena. In the Amended Petition, the Department maintained that despite several years passing since service of the Subpoena, and despite the Third Circuit Court's decision that the Department may apply its usury laws to Titlemax, Titlemax has still not produced the requested documents. The Department explained that through its years-long investigation, it has reason to believe that Titlemax has directly violated Section 201(a) of the LIPL, 41 P.S. § 201(a) and Sections 3(A) and 13 of the CDCA, 7 P.S. §§ 6203(A), 6213, by extending loans of less than $50,000 to thousands of Pennsylvania borrowers with an interest rate in excess of 6%. The 2017 Subpoena seeks relevant and necessary information relating to these alleged statutory violations, and will allow the Department to determine: (1) the extent of Titlemax's

lending in Pennsylvania, and (2) the appropriate damages for any illegal lending activities, which may include the payment of restitution to aggrieved borrowers, *see* Section 506(c)(3) of the LIPL, 41 P.S. § 506(c)(3),[4] or the imposition of fines, *see* Section 505(b) of the LIPL, 41 P.S. § 505(b).[5]  Without the records sought in the subpoena, the Department argues it is unable to identify which Pennsylvania borrowers may be entitled to restitution and what, if any, fines should be imposed against Titlemax for its illegal lending practices. The Department asks this Court to enforce the subpoena so it may continue its investigation and fulfill its regulatory responsibilities pursuant to the LIPL and the CDCA.  Specifically, the Department asks this Court to:

1.  Establish a deadline as to when Titlemax must produce the records and information requested in the subpoena;

2.  Require Titlemax to file with the Court a declaration from one of its corporate officers stating under the penalty of perjury that he or she certifies that the records and information being provided are true and accurate to the best of his/her knowledge and belief and that he or she has taken reasonable steps to search for and obtain the records and information requested in the subpoena; and

---

[4] Section 506(c)(3) provides:

(c) If the department determines that a person has violated the provisions of this act, the department may do any of the following:

\*\*\*

(3) Order the person to cease and desist any violation of this act and to make restitution for actual damages to any aggrieved person.

41 P.S. § 506(c)(3).

[5] Section 505(b) provides: "Any person who violates a provision of this act shall be subject to a fine levied by the department of ten thousand dollars ($10,000) per offense." 41 P.S. § 505(b).

3.  Retain jurisdiction and, if necessary, hold a contempt hearing if Titlemax fails to comply with the subpoena or this Court's enforcement order.  Titlemax also seeks the costs associated with bringing this enforcement action.

(Amended Petition, Wherefore Clause.)

### Titlemax's Answer

Titlemax answered the Department's Amended Petition arguing that the 2017 Subpoena is unenforceable for several reasons.  First, Titlemax argues that the Department's Amended Petition is premature.  It maintains that to date, it has produced more than 100 loan files between Titlemax and Pennsylvania borrowers, responded to numerous requests for the production of documents and interrogatories, and participated in more than three hours of deposition testimony discussing the full range of Titlemax's lending activities.  From the date of the Third Circuit's decision (January 24, 2022) through the present, Titlemax has continually expressed to the Department a willingness to produce additional information in response to the 2017 Subpoena.  However, Titlemax maintains that the language of the subpoena has no time frame, and many, if not all, of the requests seek documents and information already in the Department's possession.  Accordingly, the parties are in the process of negotiating the scope of the requested information.  For this reason, Titlemax asks this Court to deny the Department's Amended Petition as premature.

Alternatively, Titlemax argues that if the instant action is properly before this Court, the Amended Petition must be denied because the Subpoena is overly broad and unduly burdensome.  Specifically, Titlemax argues that the Department is not using the 2017 Subpoena to investigate Titlemax's current lending practices, but rather to determine fines and restitution as a result of Titlemax's prior lending activities, which it maintains is inappropriate under the facts of this case.

While Titlemax acknowledges that Section 505 of the LIPL grants the Department the authority to issue fines for violations of the law, it maintains that remedy is not appropriate here, as the parties spent several years litigating the question of whether Pennsylvania's usury laws could be applied to Titlemax, and during that time, the state of the law was unclear.  Titlemax points out that prior to the Third Circuit's Decision, not a single federal or state court endorsed the position the Department took in its 2008 Notice, which applied the Commonwealth's usury laws to loan agreements that Titlemax argued were executed outside of the Commonwealth.  In fact, the only two courts in the country that addressed this issue came to the opposite conclusion, *i.e.*, that applying one state's lending laws to loan terms originating in another state was unconstitutional under the Commerce Clause. *See Midwest Title Loans, Inc. v. Mills*, 593 F.3d 660 (7th Cir. 2010);[6] *TitleMax*, 505 F. Supp. 3d at 360.  Titlemax maintains that it has always acted in accordance with its then-known constitutional rights and seeking information in order to retroactively impose penalties under the CDCA and LIPL for its prior lending activity would be unjust.

As for restitution, Titlemax argues that the 2017 Subpoena is overbroad and likely to lead to the production of irrelevant information because it seeks documents and information dating back more than four years.  While again acknowledging that Section 506(c)(3) of the LIPL allows the Department to order a company to make restitution for actual damages to an individual borrower, Titlemax asserts this provision is subject to the four-year statute of limitations set forth in Section 502 of the LIPL, 41 P.S. § 502.[7]  To the extent the Subpoena seeks documents and records

---

[6] In *Midwest Title Loans*, the 7th Circuit concluded that a provision of the Indiana Code that applied interest rate caps to out of state lending agreements under certain circumstances violated the Commerce Clause.  593 F.3d at 669.

[7] Section 502 (Usury and excess charges recoverable) provides:

8

created more than four years ago, such are irrelevant to the Department's investigation, rendering the broad language of the Subpoena unenforceable.[8]

By order dated May 24, 2022, this Court directed the parties to confer and file a joint status report within 30 days indicating whether the matter has been amicably resolved. Ultimately, the parties were unable to reach an agreement and the Court proceeded to a hearing on the enforceability of the Department's Subpoena on July 27, 2022.

## Relevant Law

Before summarizing the evidence adduced at the hearing, the Court sets forth the well-established standard for enforcement of an administrative subpoena. In *Pennsylvania Human Relations Commission v. Lansdowne Swim Club*, the Pennsylvania Supreme Court explained:

---

> A person who has paid a rate of interest for the loan or use of money at a rate in excess of that provided for by this act or otherwise by law or has paid charges prohibited or in excess of those allowed by this act or otherwise by law may recover triple the amount of such excess interest or charges in a suit at law against the person who has collected such excess interest or charges: *Provided, That no action to recover such excess shall be sustained in any court of this Commonwealth unless the same shall have been commenced within four years from and after the time of such payment.* Recovery of triple the amount of such excess interest or charges, but not the actual amount of such excess interest or charges, shall be limited to a four-year period of the contract.

41 P.S. § 502 (emphasis added).

[8] Citing *Pennsylvania Department of Banking v. NCAS of Delaware*, LLC, 995 A.2d 422 (Pa. Cmwlth. 2010) (*NCAS*), Titlemax also argues the Department lacks *parens patriae* standing to recover restitution. In *NCAS*, this Court concluded that the Department did not have *parens patriae* standing under the LIPL to pursue an action for monetary relief and seek damages on behalf of individual borrowers in Pennsylvania where the lender's violations of the CDCA and LIPL did not affect the efficacy or reach of a government sponsored benefits program or government entitlement, damages sought by Department represented the interests of individual borrowers rather than a quasi-sovereign interest, and the LIPL provided borrowers with a clear statutory remedy. 995 A.2d 422, 438-39.

9

> The scope of judicial review of petitions for enforcement of administrative agency subpoenas is limited to a determination whether "the inquiry is within the authority of the agency, the demand is not too indefinite[,] and the information sought is reasonably relevant."

526 A.2d 758, 763 (Pa. 1987) (quoting *Commonwealth v. Shults*, 362 A.2d 1129, 1131 (1976)). With this three-prong test in mind, the Court summarizes the evidence adduced at the hearing.

### July 27, 2022 Hearing

At the outset of the hearing, the Department indicated that it is only seeking to enforce three of the original thirteen requests for documents in the 2017 Subpoena. The Department asks this Court to enforce compliance with Item Numbers 1, 3, and 7 of the 2017 Subpoena,[9] which demand production of the following:

---

[9] Counsel for the Department explained that Item Number 6 of the 2017 Subpoena allows the Department to produce the information sought in Item Number 1 in a spreadsheet format as opposed to producing the actual documents requested. (Notes of Testimony (N.T.) at 9.) Item Number 6 of the Subpoena states as follows:

> In lieu of all documents requested in item # 1, provide a spreadsheet or spreadsheets containing information on all loans or pawns originated by you where the borrower of the loan resides in Pennsylvania, to include:
>
>     a. each borrower's name
>     b. each borrower's address
>     c. each borrower's telephone number
>     d. each borrower's e-mail address
>     e. each borrower's account number
>     f. the dollar amount of interest due and payable
>     g. the dollar amount of interest collected
>     h the interest rate charged on the loan or pawn
>     i. the amount of original principal
>     j. the remaining amount of principal
>     k. the term of the loan or pawn
>     l total dollars paid by the borrower
>     m. the loan amortization schedule
>     n. origination fees charged
>     o. collection costs charged
>     p. delinquency and default fees charged
>     q. amounts refunded, if any, by any party to borrower.

1.    All loan or pawn documents including loan agreements, promissory notes, pawn tickets, deferment agreements, TILA disclosures and security agreements between [Titlemax] and any Pennsylvania consumer.

3.    All records for electronic payment relating to Pennsylvania consumers to Title[m]ax for any loan or pawn obligation.

7.    All records involving the repossessions of vehicles owned by Pennsylvania consumers that occurred at the direction of Titlemax.  In relation thereto provide:

 a.    The name of the consumer

 b.    The date of the repossession

 c.    the make, model and year of the vehicle

 d.    the name and address of the repossessor

 e.    the name of the state from which the repossessor operated

 f.    if the repossessor is a corporation, indicate if it is affiliated in any way with Title[m]ax

 g.    any contract or written work orders Title[m]ax has with repossessors that have repossessed vehicles in Pennsylvania.

(Department's Hearing Ex. 1 at 4-6.)  Department's counsel explained that it is seeking the above documents from the outset of Titlemax's lending to Pennsylvania residents, which is not a date certain, or, alternatively, as of the date of the Department's 2008 Notice.  The Department then presented a single witness,

---

(Department's Hearing Ex. 1 at 5.)  As Item Numbers 1 and 6 seek the same information, albeit in different formats, for purposes of this opinion, the Court refers to these demands collectively as "Item Number 1."

Theresa Jones (Jones), and documentary evidence in support of its enforcement action.

Jones, an employee of the Department for 30 years, testified about her investigation into Titlemax leading up to the issuance of the 2017 Subpoena. (Notes of Testimony (N.T.) 21.)   Jones explained that she presently works in the Department's Non-Depository Compliance Office (Compliance Office) and has held that position since 2002.  (*Id*.)   She testified that in December of 2016, the Department's Deputy Secretary directed the Compliance Office to investigate certain unlicensed auto title lending companies that have an online presence in Pennsylvania. (*Id.* at 22.)  Jones was specifically assigned to investigate Titlemax. (*Id.)*

Jones testified that she began her investigation by exploring Titlemax's online presence.  She first visited the company's website in order to gain information about Titlemax's lending history, and to determine the functionality of the website for a Pennsylvania consumer.  (*Id.* at 23.)  In regard to the company's history, Jones testified that Titlemax's website contained a timeline of milestones, which included, *inter alia*, the establishment of an inhouse Information Technology Department in 2010, an online lending program on March 1, 2011, and an expansion of the legal and compliance team in 2014.  (*Id*. at 62-65; Department's Hearing Ex. 14.)  The online timeline did not indicate the date in which Titlemax began lending in Pennsylvania. (N.T. at 62.)

In terms of the website's functionality for a Pennsylvania consumer, Jones explained that she engaged in an activity called "shopping," wherein she entered information into Titlemax's website to ascertain how far she could get in the lending process from the comfort of her home.  (*Id.* at 59-61; Department's Hearing Exs. 9-

11.)  Jones testified that after entering information about the make, model, and mileage of a vehicle, identifying Pennsylvania as her home state, and providing a cell phone number with a Pennsylvania area code, Titlemax's website produced a quote on the loan amount she could secure through the company. (N.T. at 60; Department's Hearing Ex. 10 (Titlemax website yielding a loan estimate of $6,560-$7,620); Department's Hearing Ex. 11 (same).)  The website indicated that "A Title[m]ax representative will be contacting you shortly to help you get the cash you need."  (Department's Hearing Exs. 10-11.)

Jones also testified about her inquiry into Titlemax's advertising to Pennsylvania consumers.  (N.T. at 57-58.)  As part of her investigation, Jones captured screenshots of two Titlemax advertisements that she viewed when visiting PennLive's website.  (Department's Hearing Exs. 12, 13.)  The advertisements read: "Turn your vehicle title into cash this summer with Titlemax!" (*Id.*)

Based on this initial investigation, Jones determined that Titlemax was targeting Pennsylvania residents and engaging in online lending.  Accordingly, she requested that an attorney be assigned to assist her in the investigation of Titlemax's lending practices.  (N.T. at 24.)  Attorney Linda Carroll was assigned to the case, and the 2017 Subpoena issued shortly thereafter.  (*Id.*)

In response to questions from Department's counsel, Jones explained the relevancy of the documents requested in Item Numbers 1, 3 and 7 of the Subpoena to the Department's ongoing investigation.   She explained that Item Number 1 of the Subpoena, which seeks, *inter alia*, loan agreements between Titlemax and Pennsylvania consumers, provides several categories of information relevant to the investigation, including:  the ability to identify the lender who is providing the funds for the loan to the Pennsylvania consumer, their place of residence, information

13

regarding collateral that was used to secure the loan, i.e., the automobile, title number, make and model, color, percentage rate, finance charges, what the consumer actually received insofar as the loan and the total payments if the loan is effectuated to completeness.   (N.T. at 28-29.)

Jones noted that as of the date of the hearing, Titlemax had provided 203 loan agreements with Pennsylvania consumers to the Department.   (*Id.* at 30.)  Despite this voluntary sample, Jones explained that the Department has reason to believe that Titlemax has extended far more than 203 loans to Pennsylvania consumers.   She stated that the Pennsylvania Department of Transportation (PennDOT) maintains a record of all vehicle title liens in Pennsylvania, and on February 14, 2017, in an attempt to determine "how many consumers could have been affected by business transactions with Titlemax[,]"  the Department requested records from PennDOT seeking information and data concerning vehicle title liens filed by Titlemax.  (N.T. at 31-36.)   The Department's first request sought liens filed by Titlemax from January 1, 2016 through February 14, 2017.  (*Id.*, Department's Hearing Ex. 5.)  This request yielded a spreadsheet indicating Titlemax filed a total of 293 liens during that time period.   (Department's Hearing Ex. 5.)   On October 10, 2019, the Department submitted a second request to PennDOT for vehicle title liens filed by Titlemax beginning on October 10, 2013, through October 10, 2019.  (N.T. at 33-35.)   The Department's second record request yielded a spreadsheet indicating Titlemax filed a total of 2,011 liens during that time period. (*Id.*, Department's Hearing Ex. 5.)  Jones explained the significance of this finding as follows:

> It's significant in the aspect that it's – it's simple mathematics.  There's 2,011 recorded liens[,] we have a sampling of 203 [loan agreements] and realistically each of these loan transactions could be as various as the vehicles that were presented and used as collateral.  I cannot

14

definitively say that each of the loans were applied to the standard rate of interest or the terms were the same or, you know, a litany of other things. We would need to look at all those individual loan files to determine compliance with what Pennsylvania had established for lending rates for licensed or unlicensed vendors.

(N.T. at 35.)

Jones next testified about the relevance of Item Number 3 of the 2017 Subpoena, which requests Titlemax produce all payment records to the Department. Jones explained that as of the date of the hearing, Titlemax provided the Department with 212 payment records, but in order to complete its investigation, all payment records must be produced. (N.T. at 36-38.) She described that payment records are an important part of the Department's investigation because they:

> identify several factors. One, it's identifying the consumer. It also points to the amount of money that was advanced to the consumer utilizing the automobile as collateral. It also records the payments that were made by the consumer, the method in which the payments were made by the consumer, and the status of the loan, whether it was effectively paid off or if there was some other alternative action that happened as a result of the consumer either being delinquent or unable to complete the loan terms.

(*Id.* at 37-38.)

Last, Jones testified as to the relevance of Item Number 7 in the 2017 Subpoena, which seeks information regarding vehicle repossessions. Jones stated that information about repossessions is a vital part of the Department's investigation because it allows the Department to determine the disposition of Titlemax's loans following repossession. Using a hypothetical, Jones elaborated as follows:

> So say for instance I get a loan from Titlemax for $1,000 and say I'm able to stay in payment up to the point of $500. I experience some additional hardship and I'm not able to continue my payment obligation. My car is then repossessed, sold for $300 and at this point $800 of $1,000 has been realized, then it's possible, and without having

15

information to know, that I could be on the hook for the additional $200
to then make Titlemax whole. So without having the information we're
not able to say what exactly happened. And then with me making
Titlemax whole in all of this is that compliant with what Pennsylvania
would identify, you know, for its lending with Pennsylvania consumers.

(*Id.* at 42-43.)

Finally, Jones testified about the scope of the 2017 Subpoena. She explained
that the Subpoena contains no timeframe because the Department has been unable
to determine the specific start date Titlemax began lending to Pennsylvania
residents, and Titlemax has continually failed to disclose such date. (*Id.* at 48-49,
86-87.)

On cross-examination, Titlemax's counsel questioned Jones about the 2008
Notice that announced the Department's change in policy as it relates to entities
engaged in online lending. (*Id.* at 82-83.) Titlemax proffered a consumer complaint
form wherein a borrower contacted the Department stating she received a title loan
from a Titlemax located in Ohio. (*Id.*, Titlemax's Hearing Ex. A.) The complaint
form indicated that the borrower "requested to file a complaint as she is making her
payments[,] however, her interest rate is so high that she feels she will never get the
loan paid off." (*Id.*) The complaint form indicates that the Department explained to
the borrower on July 1, 2016, that "unfortunately since she crossed state lines to
obtain [t]he loan, this Department has no jurisdiction over this matter." (*Id.*) When
questioned about whether this outcome was consistent with the Department's 2008
Notice, Jones testified that while the Department advised it didn't have jurisdiction
over this specific complaint, these matters are "complex" and must be evaluated on
an individual basis. (N.T. at 83-84.)

16

Following Jones' testimony, the evidentiary record closed and counsel for the Department and Titlemax presented closing arguments.[10]  By orders dated July 27, 2022 and August 1, 2022, the parties were directed to file post-hearing briefs.

## Discussion

*Temporal Scope of Subpoena*

At the outset, the Court notes that the Department has offered to limit its requests for production of documents to those in Titlemax's possession, custody, or control beginning on July 26, 2008, the date the Department issued its 2008 Notice advising the public of the policy change regarding online lending, and ending on September 6, 2017, the return date of the Department's Subpoena.  (*See* Department's Reply Brief at 3-6; *see also supra* n.10.)  Accordingly, the Court addresses the parties' arguments and analyzes the enforceability of the Subpoena under *Lansdowne* with this limited timeframe in mind.

*Legal Standard*

As explained *supra*, the scope of judicial review of petitions for enforcement of an administrative agency subpoena is limited to determining: (1) whether the inquiry is within the authority of the agency; (2) whether the demand is not too

---

[10] During closing arguments, counsel for Titlemax argued, *inter alia*, that the Department was not entitled to records that post-dated the return date of the Subpoena, *i.e.*, September 6, 2017. (*See* N.T. at 102.)  The parties were directed to brief whether records that came into existence after the return date of a subpoena are subject to disclosure in their post-hearing briefs.  In its brief, Titlemax argued that a subpoena can only require an entity to produce documents "in its possession, custody, or control." (Titlemax's Post-Hearing Brief at 6-7 (citing *Breslin v. Dickinson Township*, 68 A.3d 49, 55 (Pa. Cmwlth. 2013)).) Therefore, it maintains the Subpoena, if enforceable, is limited to documents in the possession, custody, or control of Titlemax as of September 6, 2017. Titlemax's Post-Hearing Brief at 7.  In its brief, the Department conceded that it found no relevant authority addressing whether documents created after the issuance of a subpoena are required to be produced, and accordingly clarified that it is not requesting that this Court order the production of documents that post-date the September 6, 2017 return date of the 2017 Subpoena.  Department's Reply Brief at 6.  However, the Department reiterates its authority to seek documents that post-date the 2017 Subpoena through a subsequent subpoena.

indefinite; and (3) whether the information sought is reasonably relevant. *Lansdowne*, 526 A.2d at 763.  Here, Titlemax does not dispute the authority of the Department to issue investigative subpoenas. (*See* Section 6212 of the CDCA, 7 P.S. § 6212; Section 506(b) of the LIPL, 41 P.S. § 506(b).)  Instead, Titlemax challenges the Subpoena on the second and third *Lansdowne* prongs, arguing that the Department's demands are too indefinite and likely to elicit irrelevant information.

*Indefiniteness*

Titlemax maintains that the scope of the 2017 Subpoena is overbroad and indefinite in terms of substance and time.  As to substance, Titlemax argues that the Subpoena demands more than a dozen separate Titlemax entities to search their records for a broad range of documents involving Pennsylvania residents.  Titlemax explains that this is no small feat for the company, as its loan records are "housed within multiple Point of Sale systems," not in one "central location capable of systematic retrieval."  (Titlemax's Post-Hearing Brief at 5 (quoting Department's Hearing Ex. 2 at 7).)  While conceding that the requested documents may exist, Titlemax explains that they are kept in accordance with the record-keeping regulations of the states in which Titlemax lawfully operates and attempting to retrieve those documents would involve "laborious efforts."  (*Id.* (quoting Department's Hearing Ex. 2 at 8).)  It characterizes the Department's Subpoena as nothing more than a fishing expedition designed to search through all the "records, relevant or irrelevant, in the hope that something will turn up."  (Titlemax's Post-Hearing Brief at 3 (quoting *Lunderstadt v. Pa. House of Representatives Select Comm.*, 519 A.2d 408, 415 (Pa. 1986)).)

18

The Department responds that the 2017 Subpoena is not too wide ranging to be enforced. It notes that it has greatly limited its enforcement request to only seek production of three categories of information, as opposed to the thirteen categories contained in the original Subpoena. The documents requested in Item Numbers 1, 3, and 7 are targeted to elicit only absolutely necessary information for the Department to discharge its regulatory duty and determine Titlemax's compliance with the provisions of the CDCA and LIPL. The Department directs the Court to Jones' hearing testimony, which explained in depth why each of the documents requested in Item Numbers 1, 3, and 7 of the Subpoena play a paramount role in the Department's years-long regulatory investigation.

Titlemax next argues that the absence of time frames in the Subpoena renders it unenforceable as too indefinite. The Department responds that the absence of a timeframe in the 2017 Subpoena is a direct result of Titlemax refusing to inform the Department of when it started lending to Pennsylvania residents. The Department argues that Titlemax should not be permitted to withhold such an essential fact, while also claiming that the absence of said fact absolves them from complying with the Subpoena on grounds of overbreadth or indefiniteness.[11] However, as explained above, the Department is willing to bookend the temporal scope of the Subpoena. On the front end, the Department indicated it is willing to limit the Subpoena to request records created on or after the date of the Department's 2008 Notice, *i.e.*, July 26, 2008, as Titlemax was, at that point, on notice of the Department's position

---

[11] In its post-hearing brief, Titlemax attempts to discount the Department's position that the Subpoena does not have a start date because Titlemax refuses to advise the Department as to when it began lending to Pennsylvania residents. Titlemax argues that the Subpoena is not an interrogatory, request for admission, or any other demand which would require Titlemax to provide such information. The Court is not persuaded by this argument, which again attempts to circumvent the Department's investigation into Titlemax's lending practices on a technicality.

regarding the application of Pennsylvania's usury laws to unlicensed entities extending nonmortgage loans to Pennsylvania residents via the internet. (Department's Reply Brief at 3-6.)   On the tail end, the Department conceded it found no relevant case law which would allow the production of records after the return date of a subpoena.  Accordingly, the Department asks this Court to order the production of documents up until the return date of the Subpoena, *i.e.*, September 6, 2017.  (*Id.* at 6.)  The Department submits this limited timeframe certainly cures any temporal concerns for indefiniteness under *Lansdowne*.

*Relevancy*

Relatedly, Titlemax argues that Item Numbers 1, 3, and 7 request the production of information that is irrelevant to the Department's stated purpose of collecting information to impose fines and seek restitution under the CDCA and LIPL.  (Titlemax's Answer at 7.)  Titlemax maintains that even if the Department is able to prove that Titlemax's lending practices violated the provisions of the relevant statutes, it would be inappropriate to impose penalties under the facts of this case for several reasons.  First, Titlemax argues that the question of whether Pennsylvania's usury laws even applied to Titlemax was the subject of litigation between the parties for several years up until the Third Circuit issued its decision on January 24, 2022. (*See* Third Circuit Decision.)  To impose penalties for Titlemax's lending practices that pre-date that holding, while the state of the law was unclear, would be an unjust result.

Additionally, while Titlemax concedes that Sections 505 and 506 of the LIPL allow the Department to levy fines and seek restitution for violations of the law, it maintains those penalties are limited by the four-year statute of limitation set forth

20

in Section 502 of the LIPL.  Therefore, even assuming *arguendo* that the penalties set forth in the CDCA and LIPL can be applied to Titlemax, they may only be applied to Titlemax's lending activities in the last four years, and thus any of the requested records in Titlemax's possession, custody, or control before 2018 are irrelevant. (Titlemax's Answer at 7.)

The Department responds that the documents requested in the Subpoena are clearly relevant to the Department's ongoing investigation.   During the evidentiary hearing, Jones testified about the relevancy of Item Numbers 1, 3, and 7 in the Subpoena, and explained in detail why the Department needs that information in order to determine the extent of Titlemax's lending with Pennsylvania residents.

*Analysis*

After careful consideration, the Court concludes that Item Numbers 1, 3, and 7 of the Subpoena are enforceable under the *Lansdowne* framework for documents and records in Titlemax's possession from July 26, 2008 through September 6, 2017. With this temporal time limitation in place, the Court is not persuaded by Titlemax's arguments that the Subpoena is unenforceable as too indefinite under the second *Lansdowne* prong, or irrelevant under the third *Lansdowne* prong.

The Court rejects Titlemax's argument that the Subpoena is overly broad and unduly burdensome, and thus too indefinite to be enforced.  While Titlemax makes much of the "laborious efforts" it will take to produce such documents, it has failed to cite any caselaw that would excuse compliance with an investigatory subpoena on this basis.  Moreover, Jones' testimony at the hearing indicated that Titlemax established an inhouse Information Technology Department in 2010 and expanded its legal and compliance team in 2014.  (N.T. at 64; Department's Hearing Ex. 14.)

The Court concludes there is no reason why Titlemax's in-house resources could not produce the requested documents in Titlemax's possession during the relevant time period.

The Court is also not persuaded by Titlemax's argument that the Subpoena is likely to produce irrelevant information. Titlemax relies heavily on the four-year statute of limitations set forth in Section 502 of the LIPL for the proposition that information regarding Titlemax's lending activity that occurred more than four years ago is irrelevant to the Department's investigation. This argument fails for several reasons. First, it is premature and outside the scope of the instant proceedings for this Court to determine whether the four-year statute of limitations set forth in Section 502 of the LIPL limits the Department's ability to seek restitution under Section 506(c). As the Department remains in the investigatory stage, it has yet to demand any restitution, and the statute of limitations dispute may be appropriately argued and decided if and when a demand for restitution is made.[12]

Second, while Titlemax posits that the Department is only entitled to information that will lead to the imposition of fines or penalties, it has cited no statute or case precedent that limits an agency investigation to these precise purposes. In *In re Semeraro*, the Supreme Court cited favorably to this Court's opinion characterizing the *Lansdowne* test's "reasonably relevant" requirement as a "minimal evidentiary burden." 515 A.2d 880, 882 (Pa. 1986). The Court explained "'[r]easonably relevant,' for purposes of an investigatory body's subpoena power, means that there must be some evidence establishing that the testimony sought will likely touch upon the subject matter of the underlying investigation." *Id.* Here, the Court finds that Jones' testimony clearly established that the documents and records

---

[12] Likewise, Titlemax's argument regarding the Department's *parens patriae* standing is premature and outside the scope of the instant proceedings. *See supra* n.8.

sought in Item Numbers 1, 3, and 7 of the Subpoena "touch upon the subject matter" of the Department's underlying investigation into Titlemax's unlicensed lending practices to Pennsylvania consumers. Accordingly, the requests meet the minimal evidentiary burden.

## Conclusion

For the reasons articulated above, the Department's 2017 Subpoena is enforceable under the *Lansdowne* framework. Accordingly, the Court grants the Department's Amended Petition and directs Titlemax to produce all responsive documents to Item Numbers 1, 3, and 7 of Subpoena that were in its possession, custody, and control from July 26, 2008 through September 6, 2017.

_____
**RENÉE COHN JUBELIRER,** President Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Commonwealth of Pennsylvania | : | |
| Department of Banking and Securities, | : | |
| Petitioner | : | |
| | : | No. 417 M.D. 2017 |
| | : | |
| v. | : | |
| | : | |
| Titlemax of Delaware, Inc. | : | |
| Titlemax of Ohio, Inc. | : | |
| Titlemax of Virginia, Inc. | : | |
| Titlemax of South Carolina, Inc. | : | |
| Titlemax.com | : | |
| Titlemax Funding, Inc. | : | |
| And all successors or predecessors in | : | |
| interest, affiliates, subsidiaries, or | : | |
| parent companies, however named, | : | |
| Respondents | : | |

# O R D E R

NOW, February 22, 2023, upon consideration of the Commonwealth of Pennsylvania, Department of Banking and Securities' (Department) Amended Petition for Review to Enforce an Investigative Subpoena (Amended Petition), and Respondents' (collectively "Titlemax") Answer thereto, and following an evidentiary hearing on July 27, 2022, the Court hereby ORDERS as follows:

1.    The Department's Amended Petition seeking enforcement of Item Numbers 1, 3, and 7 of the investigative subpoena issued by the Department to Titlemax on August 22, 2017 (2017 Subpoena), is GRANTED.

2.    No later than **April 24, 2023**, Titlemax is ORDERED to produce all documents and records responsive to Item Numbers 1, 3, and 7 of the 2017 Subpoena that were in Titlemax's possession, custody, or control beginning on July 26, 2008, and ending on September 6, 2017.

3.    In addition to producing the responsive records described in Paragraph 2 above, no later than **April 24, 2023**, Titlemax shall provide the Department with a declaration from one of Titlemax's corporate officers stating that under penalty of perjury he/she certifies that the records and information being provided are true and accurate to the best of his/her knowledge and belief and that he/she has taken reasonable steps to search for and obtain all responsive records.

4.    The Department is directed to serve a copy of this Order on Titlemax and thereafter file a proof of service of same.

5.    Jurisdiction is retained.

_____

**RENÉE COHN JUBELIRER,** President Judge