IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| TITLEMAX OF SOUTH CAROLINA, INC., | ) ) ) | CASE NO.: 4:24-cv-04399-JD |
| Plaintiff, | ) ) | |
| vs. | ) ) | **ORDER AND OPINION GRANTING DEFENDANT'S MOTION TO** |
| WENDY SPICHER, in Her Official Capacity as Secretary of the Pennsylvania Department of Banking and Securities, | ) ) ) ) ) | **DISMISS PURSUANT TO ISSUE PRECLUSION OR YOUNGER ABSTENTION** |
| Defendant. | ) ) ) | |

This case concerns federalism and comity issues arising from a multi-jurisdictional litigation campaign challenging state regulation of short-term, collateralized title loans. Presently before the Court is Defendant Wendy Spicher's Motion to Dismiss under Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(b)(2). (DE 22.) In light of prior litigation between the parties across multiple jurisdictions, the Court directed Defendant Wendy Spicher ("Spicher") and Plaintiff TitleMax of South Carolina, Inc. ("TitleMax") to file, respectively, consolidated supplemental memoranda in support of, and in opposition to, the Motion to Dismiss. (*See* DE 69.) Although this case is stayed (DE 36), the parties have ably complied. (*See, e.g.*, DE 70 (Spicher's supplemental memoranda); DE 71 (TitleMax's consolidated response).)

For the reasons set forth below, the Court grants Defendant Wendy Spicher's Motion to Dismiss. All remaining motions are denied as moot.

1

# I.    BACKGROUND

## A.    Factual Background[1]

### 1.    TitleMax's Business

TitleMax is a South Carolina corporation with its principal place of business in Savannah, Georgia. (Compl. ¶ 10, DE 1 at 5.) TitleMax offers what South Carolina law calls "supervised loans" to consumer-borrowers. (*Id.* ¶ 9, DE 1 at 5.) These loans are secured by the consumer-borrower's car title. (*Id.* ¶ 25, DE 1 at 8.)

TitleMax has several locations in South Carolina (*id.* ¶ 22, DE 1 at 7), and with few exceptions involving servicing its loans,[2] TitleMax has "always" contracted to provide its services only in South Carolina at its "brick-and-mortar" locations. (*Id.* ¶ 25, DE 1 at 8.) In addition, TitleMax uses GPS tracking to ensure that consumer-borrowers contracting with TitleMax using the internet are located in South Carolina. (Compl. ¶¶ 43–44, DE 1 at 11–12.) Nonetheless, TitleMax has identified about 120 consumer-borrowers with "a Pennsylvania address." (*Id.* ¶ 42, DE 1 at 11.)

---

[1]    Because this is a ruling on a motion to dismiss, the Court takes as true all facts as presented in the Complaint. *See Hebb v. City of Asheville*, __ F.4th __, No. 24-1383, slip op. at 10 (4th Cir. July 23, 2025).

[2]    TitleMax explains that some activities involved with its supervised loans may not occur in South Carolina, namely:

- refinancing the loan (Compl. ¶ 25, DE 1 at 8),
- fund-disbursement through MoneyGram International, Inc. (*id.* ¶ 29, DE 1 at 9), and
- "the ministerial act of securing its lien on the borrower's motor vehicle with the appropriate agency in the state where the motor vehicle is registered by submitting the necessary lien documentation." (*Id.* ¶ 30, DE 1 at 9.)

### 2.    Pennsylvania's Relevant Actions to Regulate TitleMax

On June 7, 2024, TitleMax received a subpoena from the Pennsylvania Department of Banking and Securities ("the Department").[3] (*Id.* ¶ 64, DE 1 at 17.) The subpoena—issued by the Department and labelled "Investigative Subpoena for the Production of Documents and Information" ("the 2024 Subpoena")—demands that TitleMax produce four categories (with subparts) of records "from August 23, 2017[,] through the present" (DE 1-2 at 4–6), and that it do so "no later than July 8, 2024[.]"[4] (*Id.* at 3.) TitleMax contends this subpoena was improperly served upon it. (Compl. ¶ 69, DE 1 at 18.)

Seven days later, on June 14, 2024, the Department issued an Order to Show Cause ("OSC") to TitleMax. (*Id.* ¶72. DE 1 at 18.) The OSC was filed in an administrative proceeding in Pennsylvania within the Department ("the Pennsylvania Proceeding" or "the Proceeding"). (DE 1-1 at 4.) The OSC asserts that TitleMax must explain why it is not liable for over 5,000 violations of Pennsylvania law, each carrying "a civil penalty of $10,000," in addition to restitution. (DE 1-1 at 8.) TitleMax urges that the OSC, too, was improperly served upon it. (Compl. ¶ 76, DE 1 at 19.)

---

[3]     This was not the first subpoena TitleMax received from the Department. As recounted elsewhere, this is a "years-long dispute" between TitleMax and Spicher. *See TMX Finance LLC v. Spicher*, No. 1:24-cv-02093, slip op. at 2 (M.D. Pa. Jan. 16, 2025), ECF No. 65.

[4]     Courts may consider a document attached to a pleading when the document is "integral to and explicitly relied on in the complaint" and where no "challenge [to] authenticity" exists. *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999). Here, some of TitleMax's claims turn on the 2024 Subpoena and its domestication. (*See, e.g.*, Compl. ¶ 120, DE 1 at 30; *id.* ¶ 129, DE 1 at 33.) No one disputes the authenticity of the 2024 Subpoena.

**B.     Procedural Background**

**1.     TitleMax's Constitutional Claims**

On August 13, 2024, TitleMax filed the Complaint in this case. In it, TitleMax asserts four causes of action against Spicher (in her official capacity) under 42 U.S.C. § 1983:

- Count I: Violation of the so-called Dormant Commerce Clause of Article I, § 4 of the U.S. Constitution;

- Count II: Violation of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution;

- Count III: Violation of the Full Faith and Credit Clause of Article IV of the U.S. Constitution; and

- Count IV: Violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

(Compl. ¶¶ 105–40, DE 1 at 27–35.) These claims center on the constitutional propriety of the 2024 Subpoena and of the OSC. (*See, e.g.*, *id.* ¶¶ 111–12, DE 1 at 28.) TitleMax seeks declaratory and prospective relief, plus fees and costs. (*Id.* ¶¶ a.–g., DE 1 at 35–36.) Notably, TitleMax did *not* seek a preliminary injunction.

**2.     The Parties' Requests For Preliminary Relief and Venue-Transfer**

**(a)     *TitleMax's First Request for Injunctive Relief***

On September 25, 2024, TitleMax moved this Court for a preliminary injunction. (DE 16.) TitleMax asserted that the OSC compelled it to choose between two untenable options: either to "submit to the purported authority" of the Department in the Pennsylvania Proceeding or to "accept a default judgment" exceeding fifty million dollars. (DE 16-1 at 8.) TitleMax also argued that

4

Pennsylvania law precluded it from moving to dismiss the action on jurisdictional grounds. (DE 18 at 6.)

On September 30, 2024, Spicher responded in opposition. Her response revealed that TitleMax's response to the OSC was due—after two extensions—on September 13, 2024. (DE 17 at 5.) Spicher also explained that during the extension period, TitleMax's affiliates chose to file *five other* federal lawsuits against her in her official capacity. (*Id.* & at 4 n.1.) Those suits—which the Court will return to in due course in this Order[5]—were:

- *CCFI Companies, LLC and TitleMax of Ohio, Inc. v. Spicher ("The Ohio Suit"),* No. 3:24-cv-00220 (S.D. Ohio transferred Dec. 11, 2024);

- *TitleMax of Virginia, Inc. v. Spicher ("The Virginia Suit")*, No. 7:24-cv-00532 (W.D. Va. transferred Dec. 20, 2024);

- *TMX Fin. LLC and Title Max Funding, Inc. v. Spicher ("The Georgia Suit")*, No. 4:24-cv-00175 (S.D. Ga. transferred Dec. 4, 2024);

- *TMX Fin. Corp. Serv., Inc. v. Spicher ("The Texas Suit")*, No. 3:24-cv-02054, 2024 WL 4995580 (N.D. Tex. Dec. 5, 2024); and

- *TitleMax of Delaware, Inc. v. Spicher ("The Delaware Suit")*, No. 1:24-cv-00930 (D. Del. transferred Dec. 20, 2024).

(DE 17 at 5 n.1.) Spicher explained that only after TitleMax failed to obtain a stay in the Pennsylvania Proceeding did it—and its five affiliates in their respective lawsuits—seek six total injunctions against her. (*Id.* at 5.)

On October 10, 2024, TitleMax notified this Court that it wished to stay its earlier motion for a preliminary injunction due to TitleMax obtaining a stay three

---

[5]    This Court takes judicial notice of these lawsuits. Rule 201(b), Fed. R. Evid.; *see Corbitt v. Baltimore City Police Dep't*, 675 F. Supp. 3d 578, 587 (D. Md. 2023).

days prior in the Pennsylvania Proceeding. (*See* DE 23 at 1.) The Court granted TitleMax's motion.[6] (DE 36.) In addition, the Court ordered the parties to provide joint status reports every ninety days as to the status of the Pennsylvania Proceeding. (*Id.*) The parties have done so. (*See* First Joint Status Report, DE 63; Second Joint Status Report, DE 67; Third Joint Status Report, DE 75.)

### (b) *Spicher's Motion to Change Venue*

On November 5, 2024, Spicher moved this Court to transfer venue of this action to the Middle District of Pennsylvania. (DE 34.) In the alternative, Spicher requested that the Court stay proceedings pending resolution of the Motion to Dismiss. (*Id.* at 1.) TitleMax opposes the requested transfer on the threshold ground that it could not have initiated this action in the Middle District of Pennsylvania. Also, it argues that the relevant factors governing venue transfer weigh against such a move in this case. (*Id.* at 12–22.) TitleMax further contends that a stay is unwarranted. (*Id.* at 22–25.) This motion remains pending.

### (c) *TitleMax's Request to Lift the Stay and Grant Injunctive Relief*

On November 21, 2024, TitleMax filed two motions: one to lift the stay (DE 43) and another seeking an expedited ruling on its motion for a preliminary injunction (DE 44). TitleMax explains that it had unsuccessfully appealed the previously granted stay in the Pennsylvania Proceeding (*id.* at 3), and therefore requests an

---

[6]    The stay Order directed that the case be held in abeyance "until Defendant's appeal of the Stay Order granted in the Pennsylvania administrative proceeding that is the subject of Plaintiff's motion for a preliminary injunction has been resolved." (DE 36.) As noted *infra*, the Court lifts this stay.

Order from this Court establishing expedited briefing before the December 16, 2024, deadline to respond to the OSC. (*Id.* at 4.) TitleMax reiterates in its argument that the OSC presents a Hobson's choice. (*Id.* at 4–5.) Spicher opposes the motion, insisting that TitleMax "will not waive any constitutional rights or defenses by" responding to the OSC. (DE 47 at 1.) This motion, too, remains pending.

### 3.      Spicher's Motion to Dismiss

In Spicher's original October 7, 2024, motion to dismiss, Spicher made two arguments:

- this Court should invoke *Younger* abstention and dismiss pursuant to Rules 12(b)(1) or 12(b)(6) of the Federal Rules of Civil Procedure (DE 22 at 7–8 (citing *Younger v. Harris*, 401 U.S. 37 (1971)), and

- this Court is without personal jurisdiction under Rule 12(b)(2) of the Federal Rules of Civil Procedure (*id.* at 14–21).

Beginning in December 2024—two months after Spicher's motion to dismiss was filed—other federal courts began to rule on Spicher's and the TitleMax affiliates' motions. The Court outlines some of these rulings below[7]:

- On December 16, 2024, Spicher provided the Court with an order in *The Ohio Suit*, in which the U.S. District Court for the Southern District of Ohio granted Spicher's motion to transfer venue,[8] (DE 49);

---

[7]     Not mentioned here is *The Georgia Suit.* In Spicher's December 5, 2024, opposition to TitleMax's motion for an expedited ruling on its preliminary injunction, Spicher notified this Court of transfer of *The Georgia Suit* to the Middle District of Pennsylvania. (*See* DE 47 at 4 n.7.)

[8]     Order at 10–11, *The Ohio Suit,* No. 3:24-cv-00220 (S.D. Ohio Dec. 11, 2024), ECF No. 37.

- On December 24, 2024, Spicher provided the Court with an order in *The Delaware Suit*, in which U.S. District Court for the District of Delaware granted Spicher's motion to transfer venue,[9] (DE 52);

- Also on December 24, 2024, Spicher provided the Court with an order in *The Virginia Suit*, in which the U.S. District Court for the Western District of Virginia granted Spicher's motion to transfer venue,[10] (DE 53); and

- On January 16, 2025, Spicher provided the Court with an order from the U.S. District Court for the Middle District of Pennsylvania granting Spicher's motion and dismissing *The Ohio Suit*, *The Virginia Suit*, *The Georgia Suit*, and *The Delaware Suit* pursuant to *Younger* abstention,[11] (DE 58).

Given these developments, on May 19, 2025, the Court granted Spicher's requests to file supplemental memoranda to her motion. (DE 69.) The Court also ordered "a single, consolidated response" be filed by TitleMax to Spicher's forthcoming, "twice[-]supplemented" memoranda. (*Id.*) The parties ably complied, with TitleMax also filing a supplemental memorandum (DE 72.) These matters are now ripe for review and adjudication.

---

[9]    Order at 1, *The Delaware Suit*, No. 1:24-cv-00930 (D. Del. Dec. 20, 2024), ECF No. 43.

[10]    Order at 13, *The Virginia Suit*, No. 7:24-cv-00532 (W.D. Va. Dec. 20, 2024), ECF No. 80.

[11]    *TMX Finance LLC*, slip op at 1.

## II.    DISCUSSION

### A.    Even If Personal Jurisdiction Exists,[12] Issue Preclusion Applies, or in the Alternative, *Younger* Abstention Independently Is Warranted

Spicher consistently has maintained that *Younger* abstention should apply here. (*See* DE 22 at 7–14.) As discussed above, however, the question now before the Court is more nuanced: whether this Court's ability to abstain under *Younger* and its progeny is foreclosed by the doctrine of federal issue preclusion. Spicher says yes. (*See* DE 70 at 4–11.) TitleMax disagrees, arguing that *Younger* abstention is either wholly inapplicable, or that, even if it applies, this case presents an exception to the doctrine. In any event, TitleMax asserts that issue preclusion does not bar this Court's consideration. (*See generally* DE 71; DE 72.)

---

[12]    This Court has reason to believe that specific personal jurisdiction, at a minimum, may exist in this matter. But it remains unsettled whether the South Carolina long-arm statute reaches "an agent of a foreign state" who is "[a]cting in her official capacity[ ] . . . ." (DE 73 at 15.)

It is true that the South Carolina Supreme Court has construed the term "person" under the statute to reach the outer limits permitted by the Due Process Clause. *See Cockrell v. Hillerich & Bradsby Co.*, 363 S.C. 485, 491, 611 S.E.2d 505, 508 (2005). And *Ex Parte Young*, 209 U.S. 123, 143 (1908), was understood to be part of the judicial status of pleading causes of action at least as of 1972, when the long-arm statute was re-codified. *Cf. Branchville Motor Co. v. Adden*, 158 S.C. 90, 155 S.E. 277, 278 (1930) (explaining "judicial status" of act at time of enactment is one "natural and safe guide to [ ] intent"); *Eslinger v. Thomas*, 340 F. Supp. 886, 895 (D.S.C. 1972), *aff'd in part, rev'd in part*, 476 F.2d 225 (4th Cir. 1973) (official-capacity suit for prospective relief alleging Equal Protection claim).

But whether subsequent judicial expansion of *Ex Parte Young* can be relied on here is a question this Court need not resolve to grant Spicher's motion. Likewise, the question of whether Spicher's alleged contacts are sufficient is one that might ordinarily warrant limited jurisdictional discovery—but such discovery is unnecessary in light of this Court's ruling.

In short: the Court declines to reach and rule on Spicher's Rule 12(b)(2) arguments because even assuming personal jurisdiction exists, dismissal is required.

After careful consideration, and for the reasons below, the Court concludes that issue preclusion applies, or in the alternative, this Court must abstain under *Younger*.

### 1.     The Principles of Issue Preclusion

The doctrine of "issue preclusion ordinarily bars relitigation of an issue of fact or law raised and necessarily resolved by a prior judgment." *Bravo-Fernandez v. United States*, 580 U.S. 5, 10 (2016). As Justice Harlan explained in 1896, "[t]his general rule is demanded by the very object for which civil courts have been established," namely "to secure the peace and repose of society by the settlement of matters capable of judicial determination." *S. Pac. R. Co. v. United States*, 168 U.S. 1, 49 (1897). In addition, issue preclusion "protect[s] litigants from the burden of relitigating an identical issue with the same party or his privy" and "promot[es] judicial economy by preventing needless litigation." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979).

In the Fourth Circuit, "the proponent [seeking to establish issue preclusion] must establish" the following:

1.     "the issue sought to be precluded is identical to one previously litigated;"

2.     "the issue must have been actually determined in the prior proceeding;"

3.     "determination of the issue must have been a critical and necessary part of the decision in the prior proceeding;"

4.     "the prior judgment must be final and valid;" and finally

5.     "the party against whom estoppel is asserted must have had a full and fair opportunity to litigate the issue in the previous forum."

10

*Sedlack v. Braswell Servs. Grp., Inc.*, 134 F.3d 219, 224 (4th Cir. 1998).

That said, proponents may invoke the doctrine "defensively," *see Blonder-Tongue Lab'ys, Inc. v. Univ. of Illinois Found.*, 402 U.S. 313, 350 (1971), or "offensively." *See Parklane Hosiery Co.*, 439 U.S. at 326. In any case, there is a "mutuality" principle holding that "as a general rule, nonparties will not have had a full and fair opportunity to litigate the issues raised in the previous action." *Virginia Hosp. Ass'n v. Baliles*, 830 F.2d 1308, 1312 (4th Cir. 1987).

Yet, as the Fourth Circuit has recognized, "[u]nder some circumstances, however, nonparties can be precluded from relitigating issues determined in a prior suit." *Martin v. Am. Bancorporation Ret. Plan*, 407 F.3d 643, 654 n.18 (4th Cir. 2005) (quoting *Baliles*, 830 F.2d at 1312). This is permissible only when the non-party is of one of three classes:

- "a non-party who controls the original action";

- "a successor-in-interest to a prior party"; or

- "a non-party whose interests were adequately represented by a party to the original action."

*Martin*, 407 F.3d at 651.

### 2. The Issue On Which Preclusion Is Invoked: *Younger* Abstention

"In the main, federal courts are obliged to decide cases within the scope of federal jurisdiction." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72 (2013). However, "there are some classes of cases in which the withholding of authorized equitable relief because of undue interference with state proceedings is 'the normal thing to do[.]'" *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*

("*NOPSI*"), 491 U.S. 350, 359 (1989) (quoting *Younger v. Harris*, 401 U.S. 37, 45 (1971)). In those cases, to so withhold relief is called invoking "the *Younger v. Harris* doctrine," *Moore v. City of Asheville, N.C.*, 396 F.3d 385, 390 (4th Cir. 2005), or more simply, "*Younger* abstention." *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 431 (1982).

In *Sprint Communications, Inc. v. Jacobs*, the U.S. Supreme Court clarified that *Younger* abstention only applies to certain state cases, namely:

- "ongoing state criminal prosecutions";

- "certain 'civil enforcement proceedings'";[13] or

- "pending 'civil proceedings involving certain orders . . . uniquely in furtherance of the state courts' ability to perform their judicial functions.'"

571 U.S. at 78 (quoting *NOPSI*, 491 U.S. at 368.)

But the fact that such a case is in issue is not the end of the inquiry. That is because "underlying *Younger* abstention" is a policy of "comity and federalism," *Middlesex Cnty. Ethics Comm.*, 457 U.S. at 431 n.10, that must be furthered by abstaining in each case. *See Sprint Commc'ns, Inc.*, 571 U.S. at 81 (2013) (explaining that "additional factors [are] appropriately considered by the federal court before invoking *Younger*"). "Comity" means "a proper respect for state functions," *Moore*, 396 F.3d at 391 (quoting *Younger*, 401 U.S. at 44), and "federalism" here means, at a minimum, "tak[ing] into account that an adequate state forum for all relevant issues"

---

[13]    The Fourth Circuit has clarified that these "civil enforcement proceedings" which are "akin to a criminal prosecution in important respects" are "commonly referred to as 'quasi-criminal' proceedings[ ] . . . ." *Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 96 (4th Cir. 2022).

exists and such forum was "available prior to" the federal proceedings. *Middlesex Cnty. Ethics Comm.*, 457 U.S. at 437. So, a court considering abstaining under *Younger* must consider whether the proceeding:

- is an "ongoing state judicial proceeding";

- "implicate[s] important state interests"; and

- offers "an adequate opportunity . . . to raise constitutional challenges."

*Id.* at 432. These are referred to colloquially as the "*Middlesex* factors."

In short, courts in this circuit must follow a two-step procedure when confronted with a *Younger*-abstention issue: "if [a] case falls into one of the three settled [*Sprint*] categories, courts should go on to determine if federal involvement will in fact put comity at risk" using the *Middlesex* factors. *Jonathan R. by Dixon v. Just.*, 41 F.4th 316, 329 (4th Cir. 2022). If, on the other hand, it "does not, [then] courts need go no further," and "can properly entertain their federal-question jurisdiction without worrying about stepping on state toes." *Id.*

Nonetheless, "even when both steps are satisfied," *Younger* abstention may not apply. *Air Evac EMS, Inc.*, 37 F.4th at 96. That happens under circumstances such as "where irreparable injury is both great and immediate, where the state law is flagrantly and patently violative of express constitutional prohibitions, or where there is a showing of bad faith, harassment, or . . . other unusual circumstances that would call for equitable relief." *Mitchum v. Foster*, 407 U.S. 225, 230 (1972) (internal quotation marks and citations omitted).

With these principles in mind, the Court turns to the case *sub judice*. The Court begins by outlining the relevant decisions rendered in the parallel proceedings. The Court then addresses whether those decisions meet the elements necessary to give rise to issue preclusion with respect to each dispositive question presented here.

### 3.     The Decisions in the Parallel Proceedings

#### (a)     *The Issues Presented to Those District Courts*

As explained above, TitleMax raises four constitutional claims in this case. Review of TitleMax's complaints in each of the five other cases reveal that TitleMax raised identical claims in those courts. *See* Compl. ¶¶ 100–35, *The Ohio Suit*, No. 3:24-cv-00220 (S.D. Ohio Aug. 13, 2024), ECF No. 1; Compl. ¶¶ 103–138, *The Virginia Suit*, No. 7:24-cv-00532 (W.D. Va. Aug. 13, 2024), ECF No. 1; Compl. ¶¶ 87–123, *The Georgia Suit*, No. 4:24-cv-00175 (S.D. Ga Aug. 13, 2024), ECF No. 1; Compl. ¶¶ 82–124, *The Texas Suit*, No. 3:24-cv-02054 (N.D. Tex. Aug. 13, 2024), ECF No. 1; Compl. ¶¶ 97–131, *The Delaware Suit*, No. 1:24-cv-00930 (D. Del. Aug. 13, 2024), ECF No. 1.

As also explained above, Spicher raised two alternative defenses in this case: lack of personal jurisdiction and *Younger* abstention. Review of Spicher's papers in each of the other five cases reveals that Spicher raised these same defenses before each court. *See* Mot. to Dismiss at 7–20, *The Ohio Suit*, No. 3:24-cv-00220 (S.D. Ohio Oct. 7, 2024), ECF No. 20; Mem. in Supp. of Mot. to Dismiss at 7–21, *The Virginia Suit*, No. 7:24-cv-00532 (W.D. Va. Oct. 7, 2024), ECF No. 20; Mot. to Dismiss at 7–22, *The Georgia Suit*, No. 4:24-cv-00175 (S.D. Ga Oct. 7, 2024), ECF No. 24; Mot. to Dismiss at 7–23, *The Texas Suit*, No. 3:24-cv-02054 (N.D. Tex. Oct. 7, 2024), ECF No.

32; Mot. To Dismiss at 6–18, *The Delaware Suit*, No. 1:24-cv-00930 (D. Del. Oct. 7, 2024), ECF No. 18.

In sum, as of the date of this Order, TitleMax's constitutional claims—and Spicher's *Younger*-abstention defense now before *this* Court—have been considered by *five other* federal district courts. The Court now turns to examine the two decisions in which its sister courts addressed the *Younger*-abstention issue directly.[14]

### (b)     *The December 2024 Decision in* The Texas Suit

On December 5, 2024, the U.S. District Court for the Northern District of Texas in the *Texas Suit* resolved the *Younger*-abstention issue in Spicher's favor. In so doing, the district court elected to leave the "issues of personal jurisdiction or preclusion" unresolved. *The Texas Suit*, No. 3:24-CV-2054-N, 2024 WL 4995580, at *1 (N.D. Tex. Dec. 5, 2024). The district court's analysis of *Younger* centered on the three so-called "*Middlesex* factors." *Id*.

Beginning with the first of those factors, the district court considered "whether there [wa]s an ongoing state judicial proceeding." *Id*. The district court had no trouble concluding that this factor was met. It rejected the arguments advanced by the TitleMax affiliate about the stay in the Pennsylvania Proceeding, noting that the stay had been lifted.[15] But the Court observed that even if the stay had remained in effect,

---

[14]     Repeated for the reader's convenience—but noted *supra* text accompanying note 11—*The Ohio Suit*, *The Virginia Suit*, *The Georgia Suit*, and *Delaware Suit* were transferred to the Middle District of Pennsylvania and all were resolved by that court. *The Texas Suit* was resolved by the U.S. District Court for the Northern District of Texas.

[15]     This refers to the October 7, 2024, stay that TitleMax obtained in the Pennsylvania Proceeding. (DE 23 at 1.) That stay, as noted *supra*, was lifted on appeal.

the proceeding would still be considered ongoing, as it was "pending at the time" the TitleMax affiliate "filed its initial complaint in [*The Texas Suit*]." *Id.* (quoting *PDX N., Inc. v. Comm'r N.J. Dep't of Lab. & Workforce Dev.*, 978 F.3d 871, 885 (3d Cir. 2020).)

The district court then turned to the second *Middlesex* factor—"whether the proceeding implicates important state interests." *Id.* at *2. Quoting an earlier Third Circuit Court of Appeals decision discussing the Pennsylvania laws in issue,[16] the district court had no issue concluding that this second factor was "clearly" met. *Id.*

Turning to the final factor—whether "state law clearly bars the interposition of the constitutional claims," *The Texas Suit*, 2024 WL 4995580, at *2 (quoting *Middlesex Cnty. Ethics Comm.*, 457 U.S. at 432)—the district court again concluded this factor favored abstention. *Id.*

The district court took care to address the TitleMax affiliate's arguments about its inability to obtain a pre-merits personal jurisdiction determination and whether that would constitute irreparable harm. *Id.* at *2–3. On the first issue, the district court looked to the statutes governing the Department and the Proceeding—and authority interpreting them—to conclude that the TitleMax affiliate "has adequate opportunity to be heard" regarding its dispositive motions. *Id.* at *2. And as to the issue of "irreparable harm," the district court observed the TitleMax affiliate's conduct in the interim showed "no evidence" that they ever sought to "move for

---

[16]     The laws discussed in that Third Circuit case—*TitleMax of Delaware, Inc. v. Weissmann*, 24 F.4th 230 (3d Cir. 2022)—are the same laws enforced against TitleMax here. Notably, the *Weissmann* opinion dealt with one of the constitutional arguments raised here.

dismissal on lack of personal jurisdiction or that they were denied the opportunity to do so by the Department." *Id.* at *3.

But the district court did not end its analysis there. It went on to address other of the TitleMax affiliate's arguments for departing from *Younger* abstention, specifically invoking the risk of "great and immediate" harm and alleging "bad faith" in the Pennsylvania Proceeding. *Id.* The district court found these arguments unpersuasive. First, the district court emphasized that the TitleMax affiliate had not met its burden to show the absence of an "adequate opportunity to raise constitutional challenges," thereby foreclosing any claim of irreparable harm on that basis. *Id.*

Second, with respect to the bad-faith allegation, the district court characterized the TitleMax affiliate's claim as little more than a challenge on the "merits." *The Texas Suit*, 2024 WL 4995580, at *3. The district court also noted that Spicher had "recused herself from all TitleMax[-]related adjudicative matters," and, in light of the presumption of regularity afforded to official actions, the court found no grounds for concern. *Id.*

The district court thus granted Spicher's motion to dismiss, and denied all remaining motions—including the TitleMax affiliate's motion for a TRO and transfer motions—as moot. *Id.* at *3 & n.1.

### (c)     *The January 2025 Decision in* The Ohio Suit, The Virginia Suit, The Georgia Suit, *and* The Delaware Suit

On January 16, 2025, the U.S. District Court for the Middle District of Pennsylvania resolved the *Younger*-abstention issue in Spicher's favor in the four cases transferred to it. That district court began its comprehensive opinion by

17

outlining the "years-long dispute" between the TitleMax affiliates and the Department. *See TMX Finance LLC v. Spicher*, No. 1:24-cv-02093, slip op. at 2 (M.D. Pa. Jan. 16, 2025), ECF No. 65. Beginning with the Department's 2017 subpoena, *id.* at 3–4, the district court turned to the subsequent June 2024 subpoena and the initiation of the Pennsylvania Proceeding, *id.* at 4–5, and the six federal lawsuits filed while the Proceeding was pending. *Id.* at 5–6. The district court then described the TitleMax affiliates' efforts to stay the Pennsylvania Proceeding, *id.* at 6–7, and Spicher's motions to dismiss and change venue. *TMX Finance LLC*, slip op. at 7–9.

### (i)     Conclusion as to *Younger* Part One: The Pennsylvania Proceeding Was Quasi-Criminal

Turning to the merits of *Younger* abstention,[17] the district court began with the question of whether the Pennsylvania Proceeding was "quasi-criminal" in nature, under the law of the Third Circuit. *Id.* (quoting three-factor test for this inquiry from *Borowski v. Kean Univ.*, 68 F.4th 844, 851 (3d Cir. 2023)). The district court concluded that the first *Younger* factor was satisfied. Despite the TitleMax affiliates' objections, the court found that the Pennsylvania Proceeding had been initiated by a Pennsylvania administrative agency—an entity created by statute—thereby establishing that the Proceeding "was initiated by [Pennsylvania] in its sovereign capacity." *TMX Finance LLC*, slip op. at 15.

Next, the district court found that the purpose of the Proceeding was retributive. *Id.* at 18. Pointing to a provision of Pennsylvania law authorizing

---

[17]     The district court first noted that it had jurisdiction, rendering that portion of Spicher's argument moot. *See TMX Finance LLC*, slip op. at 9 n.8.

18

criminal penalties, the district court unequivocally rejected the TitleMax affiliates' argument concerning improper incentive structure and the purported unavailability of injunctive relief, finding both contentions misplaced and the supporting authorities inapposite. *Id.* at 15–18.

On the third *Borowski* factor, the district court concluded that the Pennsylvania Proceeding was sufficiently similar to a criminal proceeding. *Id.* at 21. The district court first noted that the scope of the 2017 subpoena directed at TitleMax and its affiliates "imbu[ed] the Pennsylvania Proceeding with a quasi-criminal quality," *id.* at 20, despite the fact that some TitleMax affiliates "were not investigated at all" in that subpoena. *TMX Finance LLC*, slip op. at 19. The district court also had no difficulty concluding that a "parallel criminal statute exist[ed]." *Id.* at 20–21. So, in sum, the proceeding was quasi-criminal.

### (ii)    Conclusion as to *Younger* Part Two: The *Middlesex* Factors Are Satisfied

Concluding the Proceeding was "quasi-criminal," the district court turned to the *Middlesex* factors, beginning with whether the Pennsylvania Proceeding was "ongoing and judicial in nature." *Id.* at 21. The district court considered and rejected each of the TitleMax affiliates' arguments—namely, that "the date the same constitutional claims pled in the federal complaint were raised in the state proceeding" controls, *id.* at 21–22 (quoting another source); that the "OSC alone is insufficient" to constitute an ongoing proceeding, *id.* at 22, and the purportedly "defective service of the OSC" rendered the Pennsylvania Proceeding not properly initiated. *TMX Finance LLC*, slip op. at 24.

The district court then pointed to the judicial nature of the Proceeding. Specifically, the Proceeding's "initiat[ion] by a formal pleading[ ]"; the TitleMax affiliates' "right to challenge" the OSC in the Proceedings; the "comprehensive set of rules" governing the Proceeding, and the TitleMax affiliates' ability to challenge the results of the Proceeding in judicial review. *Id.* at 25.

As to the second *Middlesex* factor, the district court easily rejected the TitleMax affiliates' argument about Pennsylvania's interests in this case as going to "the merits of [the] TitleMax[ ] [affiliates'] underlying claims" rather than the question of "the importance of the generic proceeding to the State[ ] . . . ." *Id.* at 25–26 (quoting *NOPSI*, 491 U.S. at 365).

On the third *Middlesex* factor, the district court considered three arguments. First, the argument that "Pennsylvania's General Rules of Administrative Practice and Procedure preclude the filing of and rulings on motions to dismiss." *Id.* at 26. The district court noted contrary language in the statutes, and explained that the TitleMax affiliates' argument bottomed on an improper assumption with no language supporting it that "state procedures will [not] afford an adequate remedy[ ] . . . ." *Id.* (quoting *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 15 (1987)).

Next, that the TitleMax affiliates had no ability to "present [their] constitutional claims" because "the Department has no authority to rule on the constitutionality of the laws it enforces." *TMX Finance LLC*, slip op. at 27. Importantly, the district court noted that it has long been the law that it is sufficient

if "state-court judicial review" permits such arguments. *Id.* (quoting *Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.*, 477 U.S. 619, 629 (1986)).

Third, that the TitleMax affiliates cannot appeal a loss in the Proceeding in Pennsylvania court due to a state jurisdictional statute. *Id.* at 27–28. The district court explained that the TitleMax affiliates' interpretation is both internally inconsistent with its position and based on a misreading of the law. *Id.* With these arguments resolved, the district court concluded that the *Middlesex* factors were satisfied.

### (iii)    Conclusion as to Exceptions to *Younger*: None Apply

The district court turned to the TitleMax affiliates' arguments about the applicability of exceptions to *Younger*, namely:

- that its injury "is irreparable" as well as "great and immediate," *id.* at 30;

- that "bad faith" exists on the part of the Department, *TMX Finance LLC*, slip op. at 31;

- that the Department is "unconstitutionally disqualified" from hearing the case, given its pecuniary interest in the outcome, *id.* at 32;

- that Spicher's presence on the Department's appellate commission renders the Proceeding inherently biased, *id.* at 33;

- that the TitleMax affiliates' relief sought is "wholly prospective" because it only seeks to prevent of "future administrative proceedings" through legal action. *Id.* at 33.

The district court rejected each argument in turn. *Id.* at 30–33. First, the district court noted that the TitleMax affiliates could raise their constitutional arguments in the Proceeding. Second, the TitleMax affiliates failed to point to anything aside from the merits of their position—which is insufficient to establish

bad faith. Third, the isolated statement on the Department's website that it is "funded entirely by the assessments and fees paid" is "plainly insufficient." *TMX Finance LLC*, slip op. at 32. Fourth, that no authority establishes that Spicher's mere presence on the appellate body renders it constitutionally defective, and besides, Spicher "previously recused herself" in related proceedings, and would do so again. *Id.* at 33. Finally, the TitleMax affiliates' arguments about "wholly prospective relief" ignore the context—that "the purpose of [the] TitleMax[ ] [affiliates'] singular request for prospective relief *cannot be separated* from the purpose of its requesting present relief or the overall purpose of [the] TitleMax[ ] [affiliates'] lawsuits, i.e., to *interfere with the Pennsylvania Proceeding*." *Id.* at 34 (emphasis added). With no exception applicable to the facts, the district court decided to abstain.

Having reviewed the opinions of the district courts in the Northern District of Texas and the Middle District of Pennsylvania, the Court now turns to TitleMax's supplemental memoranda, wherein it argues that events occurring subsequent to the issuance of the Middle District of Pennsylvania's opinion bear upon this Court's analyses under the principles of issue preclusion and *Younger*.

### 4.    TitleMax's Supplemental Memorandum of June 5, 2025

On June 5, 2025, TitleMax filed a supplemental memorandum. (DE 72.) In it, TitleMax provides additional history of the Pennsylvania Proceeding. Specifically, that on May 29, 2025, TitleMax and its affiliates' interlocutory appeal of a proposed denial of their constitutional objections to personal jurisdiction was itself denied ("the May 28 Commission Denial"). (DE 72 at 1–2; *see* DE 72-1 (the denial itself).) Also,

TitleMax explains that it lost on appeal to the Pennsylvania Commonwealth Court regarding denial of the November 15, 2024, motion to stay in an order and opinion issued on May 28, 2025 ("the May 29 Commonwealth Court Denial"). (*See* DE 72 at 1; *see also TitleMax of Delaware v. Dep't of Banking & Securities*, No. 1697 C.D. 2024, slip op. at 1 (Pa. Commw. Ct. May 28, 2025).)

In its briefings, TitleMax contends that these decisions of May 28 and May 29, 2025, undermine the Northern District of Texas's decision in *The Texas Suit* as well as the Middle District of Pennsylvania's decision in *The Ohio Suit*, *The Virginia Suit*, *The Georgia Suit*, and *The Delaware Suit*. (*See* DE 72 at 2.) Spicher, in response, maintains that the supplemental authority does not alter the Court's analysis. (*See* DE 73 at 3.) The Court addresses the merits of each of these arguments below in its analysis.

All this in hand, the Court now turns to the central issue in this case: whether TitleMax's challenge to Spicher's *Younger*-abstention defense to its constitutional claims are precluded by prior litigation. To begin the analysis, the Court turns to a threshold ripeness concern about TitleMax's claims regarding the 2024 Subpoena.

### 5.    TitleMax's Claims as to the 2024 Subpoena Are Unripe

As noted above, TitleMax challenges two separate actions of the Department— the 2024 Subpoena and the OSC. TitleMax argues that both the 2024 Subpoena and the OSC violate constitutional principles.

TitleMax notes that the 2024 Subpoena "seeks [ ] documents for a seven-year period running from August 23, 2017, through the present." (Compl. ¶ 71, DE 1 at 18.) This, TitleMax asserts, violates the Constitution in the following particulars:

- it "is attempting to regulate 'commerce that takes place wholly outside of [Pennsylvania]'s borders,'" (*id.* ¶ 113, DE 1 at 28 (quoting another source));

- it "deprives TitleMax . . . of its rights under the Due Process Clause," (*id.* ¶ 120, DE 1 at 30); and

- it did not comply with South Carolina law regarding domestication, violating Full Faith and Credit and Equal Protection principles, (*id.* ¶¶ 131, 137–38, DE 33–35).

Accordingly, TitleMax asks this Court to issue a judgment that the 2024 Subpoena is "null and void." (*Id.* at a., DE 35.)

But as TitleMax explains in the context of *Younger* abstention, "a subpoena, and even a subpoena enforcement action (*which has not occurred yet*) is *not* a 'civil enforcement proceeding' . . . ." (DE 71 at 9 (emphasis added).) Indeed—a decision by this Court on TitleMax's claims as to the 2024 Subpoena would be problematic for other reasons, too—for to do so would venture outside of a ripe controversy.

Ripeness doctrine arises from, and "is founded in[,] the constitutional requirement that there must be a 'case or controversy' before courts can act."[18] *Ent. Concepts, Inc., III v. Maciejewski*, 631 F.2d 497, 500 (7th Cir. 1980). It is closely related to standing, but principally has to do with the timing of the suit. *Cf. Norfolk & W. Ry. Co. v. Bhd. of R.R. Signalmen*, 164 F.3d 847, 856 (4th Cir. 1998). As this

---

[18]    For this reason, the Court does not rely on the Middle District of Pennsylvania's resolution of this issue.

suggests, claims are not ripe if they "depend[ ] on 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Trump v. New York*, 592 U.S. 125, 131 (2020) (quoting another source). The commonly repeated formulation is that "ripeness turns on 'the fitness of the issues for judicial decision' and 'the hardship to the parties of withholding court consideration.'" *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983) (quoting *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–149 (1967)).

The ripeness problem here flows from the nature of the subpoena. Whereas the OSC served to initiate the Pennsylvania Proceeding, the 2024 Subpoena merely compelled TitleMax to produce certain materials. (*See* DE 1-2 at 2–6.) As noted *supra*, the 2024 Subpoena was issued by the Department. (*See id.* at 3.) But under Pennsylvania law, a court order is *required* for enforcement—making this a non-self-executing subpoena. *Cf.* 7 Pa. Stat. Ann. § 6212 (West, Westlaw through Act 38) (noting that "In case of disobedience of any subpoena . . . , the Secretary of Banking may invoke the aid of the courts, *and such court shall thereupon issue an order requiring the person subpoenaed to obey the subpoena*" (emphasis added)).

As noted, TitleMax concedes the 2024 Subpoena has not been enforced against it. (*See* DE 71 at 9.) The mere fact that TitleMax faces a "decision to comply with" the 2024 Subpoena, *Wearly v. F.T.C.*, 616 F.2d 662, 667 (3d Cir. 1980), is not sufficient to create a ripe controversy. *See Google, Inc. v. Hood*, 822 F.3d 212, 226 (5th Cir. 2016) (observing that it is not obvious why "a state's non-self-executing subpoena should be ripe for review," especially "when there is no current consequence for resisting the

subpoena and the same challenges raised in the federal suit could be litigated in state court"). Notably, too, TitleMax does not explain how withholding a decision here would constitute a hardship for it.

Moreover, despite continuing to press its claim following the submission of its supplemental memoranda, TitleMax has brought no enforcement action to the Court's attention—an omission that is particularly notable given that the deadline has already passed. This absence of enforcement activity reinforces the conclusion that any such action remains a "contingent future event" that may never materialize. *Trump*, 592 U.S. at 131. Accordingly, as TitleMax is presently confronted only with the decision whether to comply with the 2024 Subpoena, the Court dismisses those claims challenging the Subpoena as unripe.

### 6. TitleMax's Claims as to the OSC Are Barred by *Younger* Under Principles of Federal Issue Preclusion

#### (a) *The Court May Consider Preclusion Now*

TitleMax briefly contends that it is premature to address issue preclusion at this stage of the proceedings. (DE 71 at 22.) This argument, however, is readily dismissed. The Court may properly consider issue preclusion at this juncture, especially given the extraordinary circumstances of this litigation.[19]

---

[19] TitleMax is correct as a matter of general federal practice: indeed, "the defenses of claim preclusion and issue preclusion are affirmative defenses." *Georgia Pac. Consumer Prods., LP v. Von Drehle Corp.*, 710 F.3d 527, 533 (4th Cir. 2013) (emphasis added). But "[i]t is well-settled in the Fourth Circuit that a court ruling on a motion to dismiss may properly consider affirmative defenses when such defenses 'clearly appear on the face of the complaint.'" *Turner v. Virginia Dep't of Med. Assistance Servs.*, 301 F. Supp. 3d 637, 643 (E.D. Va. 2018) (quoting *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993)). (Continued)

### (b)   *The Issue Sought To Be Precluded Is Identical*

The first element of issue preclusion requires classifying the issues previously decided and determining whether they are identical to those presented here. As noted, there is one relevant issue presented here as being subject to preclusion—*Younger* abstention. But this is composed of three sub-issues:

- whether the Pennsylvania Proceeding falls into any one of the three *Sprint* categories, and if it does,

- whether analysis of the *Middlesex* factors indicate any problems with comity or federalism, and

- whether any exception to *Younger* applies.

*See Jonathan R. by Dixon*, 41 F.4th at 329; *Mitchum*, 407 U.S. at 230.

### (i)   The Factual and Legal Components of the Sub-Issues Addressed Are Identical

To begin with, TitleMax does not dispute the Fourth Circuit's articulation of the elements of *Younger* compared to those adopted by the Third or Fifth Circuits. Nor should it. As the Supreme Court has explained—"if federal law provides a single standard, parties cannot escape preclusion simply by litigating anew in tribunals that apply that one standard differently." *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 154 (2015).

---

There is no dispute that "a district court may properly 'take judicial notice of facts from a prior judicial proceeding when the collateral estoppel defense raises no disputed issue of fact." *Id.* (alterations adopted) (quoting *Ashe v. PNC Fin. Servs. Grp.*, 652 Fed. App'x. 155, 157 (4th Cir. 2016) (per curiam)). As noted above, this Court has taken notice of TitleMax's other lawsuits. Critically, despite bringing new facts to this Court's attention—which the Court addresses in-text—TitleMax has *not* disputed the completeness of any facts addressed by the district courts in the Northern District of Texas or the Middle District of Pennsylvania.

Moreover, the Court concludes that the factual and legal components underlying these determinations—raised at the same procedural stage and addressed under the same standard—are identical to those presented in *The Texas Suit*, *The Ohio Suit*, *The Virginia Suit*, *The Georgia Suit*, and *The Delaware Suit*.[20]

In its consolidated response, TitleMax offers minimal opposition to this conclusion, arguing only that *The Texas Suit* "was decided under a stay order" and that TitleMax's affiliates brought that suit. (DE 71 at 24.) These contextual distinctions are insufficient to preclude the application of issue preclusion. In fact, as the district court in *The Texas Suit* acknowledged, its order was issued *after* the stay had been lifted. *See* 2024 WL 4995580, at *1. While the issue of privity will be addressed *infra*, it is sufficient for present purposes to note that a mere difference in party identity does not defeat preclusion where, as here, the underlying issues are the same.

### (ii)    The Purportedly New Issues Either Are Not New, or They Independently Are Insufficient Under *Younger*

Turning to TitleMax's additional arguments about the implications of the decisions of May 28 and May 29, 2025—the Court finds these arguments unpersuasive. TitleMax contends that:

- the May 28 Commission Denial means TitleMax now has no ability to raise its Due Process claim or make a special appearance to contest personal jurisdiction such that *Middlesex* factor three is unsatisfied (*id.* at 2–3);

---

[20]    Of course, these determinations involve numerous discrete issues of fact and law. But "ordinarily [issue preclusion] is appropriate as to issues defined by application of legal rules to *historic* facts that *were completed by the time of the initial decision*." 18 Wright & Miller, *Federal Practice & Procedure* § 4425 (May 21, 2025, update) (emphasis added). As noted *supra* note 19, that describes this situation.

- the May 28 Commission Denial has undermined the preclusive weight this Court should give *The Texas Suit*, regarding TitleMax's ability to assert defenses (*id.* at 3–5); and

- in the light of the dicta in the May 29 Commonwealth Court Denial, the May 28 Commission Denial illustrates "egregious manipulation of the system" and "structural bias and bad faith" calling for departure from *Younger*. (*Id.* at 5–6.)

In short—these arguments do not change the Court's conclusion about the appropriateness of preclusion. While the Court recognizes TitleMax's constitutional concerns about Due Process, the May 28 Commission Denial illustrates that TitleMax and its affiliates *can* raise those very concerns in the Proceeding, and seek interlocutory appeal of a rejection of those concerns. Indeed, the basis for rejecting TitleMax and its affiliates' interlocutory appeal was simply that it was "not properly before [the appellate body] pursuant to 1 Pa. Code § 35.190 . . . ." (DE 72-1 at 2.) The quoted provision of law provides that only "*in extraordinary circumstances* where prompt decision by the agency head is necessary to prevent detriment to the public interest" does an interlocutory appeal lie. 1 Pa. Code § 35.190(a) (West, Westlaw through Penn. Bulletin, Vol. 55, Num. 29) (emphasis added). Despite TitleMax's characterization of the May 28 Commission Denial as a "refus[al] to rule" (DE 72 at 4), it instead appears to be a denial. *See* 1 Pa. Code § 35.190(c). And denial suggests an opportunity to be denied.

The May 28 Commission Denial—though TitleMax and its affiliates are fully entitled to disagree with it—likely does not constitute a "new fact" for purposes of issue preclusion. After all, TitleMax and its affiliates raised their personal

jurisdiction objection under the same statutory scheme that was in effect when the district courts in the Northern District of Texas and the Middle District of Pennsylvania rendered their decisions. *See, e.g.*, *The Texas Suit*, 2024 WL 4995580, at *2 (noting TitleMax's affiliate had "an adequate opportunity to be heard" on personal jurisdiction). Those courts addressed that scheme. It is therefore unclear why TitleMax and its affiliates' choice to delay asserting that objection until January 30, 2025, should bear any significance for preclusion purposes.

Moreover, the third *Middlesex* factor requires only "an *adequate* opportunity . . . to raise constitutional challenges." *Middlesex Cnty. Ethics Comm.*, 457 U.S. at 432 (emphasis added). State-court review of TitleMax and its affiliates' claims *was* available under that same statutory scheme addressed by the district courts. *See, e.g.*, *TMX Finance LLC*, slip op. at 27 (explaining "state-court judicial review of the administrative proceeding" suffices (quoting *Dayton Christian Sch., Inc.*, 477 U.S. at 629)). TitleMax and its affiliates have, in fact, since availed themselves of this remedy. (Third Joint Status Report at 1–2, DE 75 at 1–2.) Their decision to do so only *after* the district courts in the Northern District of Texas and the Middle District of Pennsylvania had determined the adequacy of that scheme under *Younger* does not change the preclusive effect of those decisions.

But even if the May 28 Commission Denial were deemed a new fact under an independent *Younger*-abstention analysis—into which this Court incorporates in full the reasoning of the U.S. District Court for the Middle District of Pennsylvania as stated in its January 16, 2025, Memorandum—it would not render the Pennsylvania

Proceeding inadequate. That is because the third *Middlesex* factor is plainly satisfied. *Cf. Laurel Sand & Gravel, Inc. v. Wilson*, 519 F.3d 156, 167 (4th Cir. 2008) (the fact that a federal plaintiff "did in fact raise" his procedural due-process challenge before administrative tribunal sufficient for *Younger*).

TitleMax presses that one further "new fact" supports this Court not applying *Younger* under that doctrine's "bad faith" exception. *See, e.g.*, *Middlesex Cnty. Ethics Comm.*, 457 U.S. at 429 (explaining that "bad faith, harassment, or other extraordinary circumstance [ ] would constitute an exception to *Younger* abstention"). The substance of this allegation is that the Department represented to TitleMax and its affiliates—and to the Pennsylvania Commonwealth Court—that TitleMax and its affiliates *would* have an opportunity to file an "interlocutory appeal" on the issue of personal jurisdiction. (DE 72 at 5 (quoting *TitleMax of Delaware*, No. 1697 C.D. 2024, slip op. at 10 n.7).) But nonetheless, "days after" the May 29 Commonwealth Court Denial, TitleMax's interlocutory appeal was met with the May 28 Commission Denial, which TitleMax characterizes as an "order dismissing the appeal on the *ipse dixit* that [the appellate body] could not review the" motion to dismiss.[21] (DE 72 at 5–6.)

It goes without saying that "[t]he basic due process requirement of a 'fair trial in a fair tribunal' applies to administrative agencies as well as to courts." *FERC v. Powhatan Energy Fund, LLC*, 286 F. Supp. 3d 751, 768 (E.D. Va. 2017) (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975) (alterations adopted)). But equally, "a

---

[21]     Initially, TitleMax explained that the Department's appellate body declined to rule on TitleMax's motion to dismiss within a statutory deadline. (Second Joint Status Rep. at 2, DE 67 at 2.)

person claiming bias on the part of an administrative tribunal 'must overcome a presumption of honesty and integrity in those serving as adjudicators.'" *Hicks v. City of Watonga*, 942 F.2d 737, 746 (10th Cir. 1991) (quoting *Withrow*, 421 U.S. at 47)).

To begin with, the district courts in the Northern District of Texas and the Middle District of Pennsylvania did not have the May 28 Commission Denial and the May 29 Commonwealth Court Denial before them. Nonetheless, under an independent *Younger*-abstention analysis, the Court concludes TitleMax does not meet its burden—whether alone or considered with previous allegations. Mere characterization of the May 28 Commission Denial as "*ipse dixit*" is insufficient. Nor is the order inconsistent with what was purportedly represented, as noted in the May 29 Commonwealth Court Denial. So, even under a *Younger* analysis divorced from issue preclusion, this scintilla does not call fairness into question.

The bottom line is this: the district courts in the Northern District of Texas and the Middle District of Pennsylvania concluded that abstention from exercising Article III jurisdiction under *Younger* and its progeny is appropriate. TitleMax's newly alleged—and independently insufficient—factual allegations do not change that conclusion. So, this element is satisfied.

### (b)    *The Issue Was Actually Determined*

"An issue has been actually determined or litigated in the previous action 'if the parties to the original action disputed the issue and trier of fact resolved it.'" *Cassell v. United States*, 348 F. Supp. 2d 602, 605 (M.D.N.C. 2004) (quoting another source). As this Court has previously detailed, there is one issue—*Younger*

32

abstention. And the sub-issues necessary to resolve the applicability of *Younger* abstention—namely, that the Pennsylvania Proceeding constitutes a quasi-criminal civil enforcement action, *see TMX Finance LLC*, slip op. at 14–21, that the *Middlesex* factors are satisfied, *id.* at 21–29, and that no exception to *Younger* applies, *id.* at 29–35—were all fully litigated and adjudicated. Indeed, the latter two determinations were independently resolved in *The Texas Suit* as well. 2024 WL 4995580, at *1–3.

TitleMax offers minimal opposition to this element, arguing only that the resolution of *The Texas Suit*, *The Ohio Suit*, *The Virginia Suit*, *The Georgia Suit*, and *The Delaware Suit* did not address Spicher's authority to "regulate business activities occurring exclusively in South Carolina." (DE 71 at 25.) But TitleMax and its affiliates attack the application of the same Pennsylvania laws in the Pennsylvania Proceeding—and as noted *supra*, in each case Spicher presented the issue of *Younger* abstention by seeking dismissal on that basis. So, TitleMax offers only a characterization, not a relevant difference.

True distinctions in the issues do not depend on such semantics. For example, in *Martin*, a class- and derivative-action suit was brought by retirees seeking a judgment against their former employer's ERISA plan for certain promised but allegedly unpaid benefits. 407 F.3d 648–49. The former employer contended collateral estoppel applied, arguing that a prior declaratory judgment action against another employee resolved the issue. *Id.* at 649. But as the Fourth Circuit explained, the other employee's action resolved only whether certain "amendments . . . were adopted in accordance with plan documents." *Id.* at 653–44. Clearly, that was *not* the same issue

as whether a summary plan description entitled the retirees to certain benefits. *Id.* at 654. No such distinction between the issue actually determined and that presented here exists—as it must for this element to fail. *See, e.g.*, *Sedlack*, 134 F.3d at 224 (concluding that where "the dispositive issue" was "whether [an] accident was work-related" as compared to "whether an injury occurred" on a specific day, there is no identity of issues).

Moreover, while TitleMax's observation is accurate, it is ultimately beside the point. TitleMax's underlying premise appears to be either that South Carolina occupies a privileged position among its sister States—a proposition at odds with TitleMax's purported invocation of federalism principles—or that federal district courts may be selectively invoked to produce varying constitutional outcomes. In either case, the argument fails to undermine the dispositive fact that the Middle District of Pennsylvania squarely resolved both prongs of the *Younger*-abstention analysis as well as possible exceptions to that doctrine. So, this element, too, is satisfied.

### (c)    *Determination of the Issue Was Critical and Necessary*

"[I]n describing the scope of the 'critical and necessary' criterion," the Fourth Circuit has emphasized restrictiveness, pointing to its use of "the alternative word 'essential.'" *In re Microsoft Corp. Antitrust Litig.*, 355 F.3d 322, 327 (4th Cir. 2004) (quoting another source). In both the Northern District of Texas and the Middle District of Pennsylvania, the district courts were unequivocal about what they were resolving. *See TMX Finance LLC*, slip op at 9 (noting that "[t]he court agrees" with

Spicher's argument "that the *Younger*[-]abstention doctrine necessitates the dismissal of [the] TitleMax[ ] [affiliate's] lawsuits"); *TMX Fin. Corp. Servs., Inc.*, 2024 WL 4995580, at *1 ("The Court holds that abstention under the *Younger* doctrine is proper.").

In short—neither court "qualified" its holding. *Tuttle v. Arlington Cty. Sch. Bd.*, 195 F.3d 698, 704 (4th Cir. 1999) (no preclusion where injunction against school policy applied "as long as" a purportedly constitutionally defective selection process was employed). As the exposition of those decisions suggests, the Court has carefully scrutinized each court's holdings for alternatives, qualifications, or elaborate dicta in resolving the issues—and it found none.[22] So, the determinations of the issue of *Younger* abstention was critical and necessary. This element, too, is satisfied.

### (d)    *The Prior Judgment on That Issue Is Final and Valid*

TitleMax presses that the dismissals in *The Texas Suit*, *The Ohio Suit*, *The Virginia Suit*, *The Georgia Suit*, and *The Delaware Suit* were without prejudice. (DE 71 at 25.) But in the very case TitleMax cites to suggest a lack of finality, the Fourth Circuit wrote that "if the grounds of the dismissal *make clear that no amendment could cure the defects in the plaintiff's case*, the order dismissing the complaint is final in fact and appellate jurisdiction exists." *Mallory v. Fahey*, 390 F. App'x 240, 240 (4th Cir. 2010) (per curiam) (alterations adopted). That describes the orders here. Despite TitleMax's appeals, the orders are sufficiently "final" so as not to impede their

---

[22]    It bears noting again that the district courts in the Northern District of Texas and the Middle District of Pennsylvania resolved Spicher's *Younger*-abstention defense at the motion-to-dismiss stage, applying the same plaintiff-friendly pleading standard.

preclusive effect. *See Perry v. LaHood*, No. 1:09CV62 (JCC), 2009 WL 1350470, at *6 (E.D. Va. May 12, 2009) ("It is well settled that the pendency of an appeal does not affect the finality of the trial court's order dismissing the case."). TitleMax raises no reason to question the validity of the orders—and the Court finds none. So, this element is satisfied.

### (e)    *TitleMax Had a Full and Fair Opportunity to Litigate the Issue*

Here, Spicher asserts non-mutual issue preclusion in a "defensive" posture. *See In re Microsoft Corp. Antitrust Litig.*, 355 F.3d at 326 ("[W]hen a defendant employs the doctrine 'to prevent a plaintiff from asserting a claim the plaintiff has previously litigated and lost against another defendant,' it is known as 'defensive collateral estoppel.'" (quoting another source)). Spicher relies on the prior determinations of the Northern District of Texas and the Middle District of Pennsylvania on *Younger* abstention as to TitleMax's *affiliates* to bar *TitleMax's* claims in this proceeding. (DE 70 at 4–10.) The collateral estoppel here is "non-mutual," such that the "full-and-fair opportunity to litigate" and "privity" components of the issue-preclusion analysis necessarily overlap. *See, e.g.*, *Martin*, 407 F.3d at 654 n.18.

On this point, TitleMax makes three arguments:

- TitleMax did not participate in, let alone control, *The Texas Suit*, *The Ohio Suit*, *The Virginia Suit*, *The Georgia Suit*, or *The Delaware Suit*;

- TitleMax is not a successor-in-interest of any of the affiliates in those suits;

- TitleMax's interests were not adequately represented in the previous suits.

(DE 71 at 23–24.)

As courts have long recognized, "privity is no talismanic concept," but rather, "a word used to say that the relationship between the one who is a party on the record and another is close enough to include that other within the res judicata." *United States v. Manning Coal Corp.*, 977 F.2d 117, 121 (4th Cir. 1992) (quoting another source), *as amended* (Jan. 20, 1993). The Fourth Circuit has made clear that privity exists when "a non-party whose interests were adequately represented by a party to the original action" asserts preclusion. *Martin*, 407 F.3d at 651. Fundamentally, privity serves to ensure fairness in the application of non-mutual preclusion, and the inquiry is an objective one. *See S.E.C. v. Resnick*, 604 F. Supp. 2d 773, 779–80 (D. Md. 2009) ("For purposes of collateral estoppel, however, the key is the objective fullness and fairness of the opportunity to litigate.")

If the standard of privity can be met anywhere, it is here. TitleMax is closely affiliated with the corporate entities involved in the other suits, as its coordinated litigation strategy strongly suggests. *Cf. Cent. Transp., Inc. v. Four Phase Sys., Inc.*, 936 F,2d 256, 260 (6th Cir. 1991) (noting the "close affiliation, joint legal representation and identity of interests" as sufficient for privity); *Ruiz v. Comm'r of Dep't of Transp. of City of New York*, 858 F.2d 898, 903 (2d Cir. 1988) (explaining that after having "examined all of the surrounding circumstances" privity was warranted). Indeed, each of TitleMax's affiliates raised legal claims identical to those presented here in response to the same actions by the Department. Indeed, the Department asserted the same penalties against each of TitleMax's affiliates, and did so in the same administrative proceeding. And critically, all six suits were filed by TitleMax

and its affiliates on the same day in six different federal district courts—further underscoring the shared legal strategy and alignment of interests.[23]

If further confirmation were needed, the record provides direct evidence of the corporate relationship. *See* Compl. ¶ 4, No. 4:24-cv-00175-RSB-CLR (S.D. Ga. transferred Dec. 4, 2024) ECF No. 1 (noting "TMX is the parent company *of the various 'TitleMax' entities* (among others)" that has a "principal place of business in Savannah, Georgia" (emphasis added)). Notably, TitleMax's principal place of business is Savannah. (Compl. ¶ 10, DE 1 at 5.) In short—TitleMax's interests were not only aligned with those of its affiliates—they were adequately represented. Accordingly, for all the reasons discussed above, the Court concludes that TitleMax had a full and fair opportunity to litigate these issues because it was in privity with the parties to the prior actions.

As each of the necessary elements for issue preclusion is satisfied, the Court holds that issue preclusion applies. TitleMax's Complaint must, therefore, be dismissed under *Younger*-abstention grounds. *See Grieve v. Tamerin*, 269 F.3d 149, 153 (2d Cir. 2001) (affirming Eastern District of New York decision to abstain under *Younger* in Hague Convention case because collateral estoppel applied). As an alternative holding, the Court concludes that *Younger* abstention independently is

---

[23]     That TitleMax and its affiliates coordinated their filings to all land on the same day to avoid exposure to the first-to-file rule and consolidation need hardly be said.

In addition, the Court notes that the same law firm represents TitleMax and its affiliates in all its suits—as the Second Circuit observed, "although not conclusive on the issue of privity, the fact that the parties in [the earlier-filed cases] and in this case had the same attorney in actions brought at about the same time is of 'singular significance.'" *Ruiz*, 858 F.2d at 903 (quoting another source).

warranted for the reasons recounted above and in the already-incorporated analysis of the U.S. District Court for the Middle District of Pennsylvania.

The Court makes two further notes. First, this Court has not overlooked the Fourth Circuit's instruction that "the commerce power itself justifies a narrower view of state interests in the abstention context." *Harper v. Pub. Serv. Comm'n of W.VA.*, 396 F.3d 348, 356–57 (4th Cir. 2005) (explaining the "peculiarly national interest—and therefore, more limited state interest" involved with claims under the Article I Commerce Power). However, the force of that consideration is significantly diminished here—given that TitleMax has *already* litigated this precise issue—and lost. *See TitleMax of Delaware, Inc.*, 24 F.4th at 238–41 (rejecting TitleMax's affiliate's Commerce Clause claim regarding a 2017 subpoena issued by the Department). Indeed, the prolonged and duplicative consumption of judicial resources across multiple jurisdictions occasioned by this dispute more closely resembles a strain on, rather than a vindication of, national interests.

Second and equally, the Court acknowledges the amicus curiae brief filed by the Attorney General of South Carolina, which was submitted with leave of the Court in support of TitleMax's position. (*See* DE 28; *see also* DE 38.) The amicus brief raises concerns regarding the extraterritorial application of Pennsylvania law, the preservation of South Carolina's regulatory sovereignty, and the federalism implications of Defendant's conduct. The Court has considered these arguments in its resolution of the motion to dismiss and notes that while the views expressed therein are important, they do not alter the conclusion that abstention is appropriate under

the principles of issue preclusion and the principles set forth in *Younger* and its progeny.

## B.    All Remaining Motions Now Are Moot

Because the Court concludes that a threshold ripeness issue exists, and where it does not, issue preclusion applies, or alternatively that *Younger* abstention independently is warranted, it declines to reach the merits of TitleMax's Motion for Preliminary Injunction. (DE 19.) Accordingly, that motion is denied as moot in light of the Court's dismissal of the Complaint.

For the same reasons, the remaining motions are rendered moot and are, therefore, denied on that basis.

*        *        *

The principle that the federal judiciary serves as a guardian of its jurisdictional boundaries is particularly relevant in cases such as this, where the dispute reflects not merely a legal disagreement but underlying tensions between differing policy judgments made by coequal sovereigns. Here, what TitleMax characterizes as regulatory overreach, Pennsylvania deems a legitimate exercise of its authority to prevent usury. These differing perspectives are the product of democratic processes—just as Pennsylvania's regulatory actions reflect the choices of its electorate, so too does TitleMax's business model reflect the policy environment sanctioned by voters and lawmakers in South Carolina.

It is not the role of this Court to evaluate the wisdom or propriety of those choices. Rather, the Court is tasked with applying established legal principles to

ensure that disputes remain within their proper jurisdictional and constitutional confines. Where litigation threatens to extend beyond those bounds, the Court's responsibility is to guide such matters back to the channels prescribed by law.

In this instance, the resolution of the case according to those principles reinforces not only federalism but also finality, consistency, and the orderly development of the law.

### III.    CONCLUSION

For the purpose of resolving the pending dispositive motion and entering this Order, the November 2024 stay ordered by this Court is hereby **LIFTED**. The Clerk is directed to update the docket to reflect that the stay is no longer in effect.

For the reasons set forth above, ripeness and issue preclusion or, in the alternative, *Younger* abstention apply, and Defendant Wendy Spicher's Motion to Dismiss (DE 22) is **GRANTED**, and Plaintiff TitleMax of South Carolina, Inc.'s Complaint is hereby **DISMISSED WITH PREJUDICE**.

All other pending motions, including Plaintiff's Motion for Preliminary Injunction (DE 19), are **DENIED AS MOOT** in light of the Court's dismissal.

**IT IS SO ORDERED.**

Joseph Dawson, III
United States District Judge

Florence, South Carolina
August 15, 2025

41